34 So.2d 216

**HUNTLEY v. STATE.**

7 Div. 926.

Supreme Court of Alabama.
March 4, 1948.

W. A. Weaver and W. T. Starnes, both of Pell City, for appellant.

A. A. Carmichael, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

304

GARDNER, Chief Justice.

The appeal is from a judgment and conviction for the offense of rape with the infliction of the death penalty.

Defendant is a Negro, twenty-eight years of age; the victim, a Mrs. Macon, a young white woman living just below Cropwell near Pell City, Alabama. At noon on April 30, last, this young woman was in her kitchen preparatory to her noon meal when a Negro man came in who had on one of her dresses which had been hanging in the rear of her place and with a heavy cloth pulled over his face, grabbed her around the shoulders and carried her to the adjoining bedroom, placed her on the bed and there accomplished his purpose, after brandishing his knife. Mrs. Macon makes no effort to identify her assailant. She merely could see from his lips down, his mouth and hands and to discover that he was a Negro. At 11:30, just previous to the assault, she had seen a Negro pass her place on the highway on a bicycle, having on some kind of a jacket, trousers and a cap of the character worn by a service filling station assistant. We gather that her supposition is this was the Negro who entered her house and assaulted her.

The details of the tragedy are here of no particular moment and may be omitted. That this heinous offense was committed is well established by the uncontroverted proof. The only real question was that of identification.

The assailant left the house by the back door and evidently threw the dress over a limb in the rear of the premises. He was arrested at Hardwick's filling station in Pell City, where he worked, about 6 o'clock in the afternoon of the same day. He was placed in an automobile and carried to jail with two of the county officials and with Mr. Macon, the husband of the assaulted woman, sitting on the rear seat with him. Defendant's theory that Mr. Macon started to strike him and was prevented by one of the officers on the front seat was denied by Macon, though it was corroborated by the officer. Another Negro appears to have been arrested about the same time but was soon released. It is evident that defendant's wearing apparel, the service station cap and the dirty looking clothes, with the fact that he rode a bicycle, led him to be first suspected and immediately arrested.

The question, however, of importance in this case, and one upon which the result of this appeal turns, is the determination of the admissibility of a written confession signed by the defendant while he was in the city jail at Birmingham, Alabama, the following day, that is, May 1st. Numerous objections were interposed to the introduction of this proof upon the theory that it was not shown to be voluntary. Concerning what occurred on this afternoon in the city jail in Birmingham it is not insisted there were threats or promises made. But, the argument is that this particular confession was but a continuation or result of a previous confession made to R. E. White, the patrolman located in Birmingham, who went to see the defendant about 9 o'clock that morning and procured a statement in the nature of a confession, which he wrote out. This particular confession was never offered in evidence. The theory of the defendant is that his conversation with White stimulated in him a hope of an early release should he plead guilty; that White had impressed him that he was his friend,

would give him aid, and that it would be better for him if he told everything. White's conversation at the Birmingham jail covered a period of one and a half or two hours; he evidently went to see him for the purpose of getting these admissions or confessions at the request of the St. Clair authorities. White admits that for a long time, during that conversation, the defendant denied having anything to do with the crime. Previous events are here important. There could be no doubt that defendant underwent much questioning from the time he was arrested and placed in jail, about 6 o'clock on the afternoon of April 30, to near 12 o'clock, when he was shot. A crowd had gathered at the jail in Pell City; there were threats that he should be taken out; he was in a cell upstairs; at one time a ladder was placed which reached his cell; three shots were fired from the crowd and the evidence indicates that two of them took effect, though producing but slight wounds, one in the arm and one in his leg. He was told to lie on the floor under the bed, the lights were extinguished and he was instructed to crawl down the stairs or go in a stooping position and the authorities placed him in a cell downstairs. At about 1 o'clock in the morning the Highway Patrol from Birmingham came and succeeded in taking him to the Birmingham jail. Among the patrolmen was R. E. White. Mr. White testified that upon discovering that he was wounded or had some blood on him they carried the defendant to the Hillman Hospital, where he was treated and given a shot in the arm. From there they returned him to the jail and placed him in the solitary confinement cell. Defendant insists he slept none that night. He further states that he was mistreated by the officers at Pell City, and that while he was in the cell a rope was placed around his neck; but the officers denied this and say he was offered no indignities at all; they admitted, however, that three of the officers questioned him for a long period of time and that he constantly denied any part in the tragedy.

The defendant was evidently without means of any character. The trial judge appointed two able members of the Pell City Bar to represent him. He has neither father, mother, brother nor sister living. He had a wife with whom he was living at the time but nothing further appears of her except something was said about his wife with White in the conversation in the morning about 9 o'clock, when he asked that she be notified.

With this background, therefore, we come to the interview with Mr. White. Defendant insists that White stated in the conversation that morning, he and White being alone in the warden's room, that he had risked his life to come and save him last night. White, as we have stated, was one of the patrolmen who had brought the defendant from Pell City to Birmingham. That after asking many questions concerning his family and the like he told him of a Negro boy who had killed a white man in St. Clair county, and that he had gotten him out of a "hornets nest"; that the boy was given only twenty-five years, served only two or three of them and then he was free. That he told him, the defendant, that if he would tell the truth about it it might be better for him, that he would not have to be gone so long; that the defendant went to crying and asked him if he would see his wife any more, and he said yes; that he asked where she lived and he told him; he asked if she had any money to come on and the defendant told him he did not know; that White then gave him his name and address and told him that if he happened to need him for anything to get someone to call him and he would come and see him. The defendant then offered in evidence the name and address given him by White, which was as follows:

"Patrolman
   R. E. White
B'ham. Ala.
   Phone—4—2551"

Defendant further stated that White told him he had nothing to help fight the case with, that it would be better for him to tell it like it was because all of them believed that he did it; and then he, defendant, told him that he would plead guilty. All of this occurred after he had given

him the card with the address and telephone number.

White stated that the first time the defendant saw him he was in uniform and the second time he was in plain clothes; that the defendant identified him and that when he started to leave he gave him that piece of paper (the address and telephone number) and told him that if he had any further statement or anything he wanted to talk about to have them to call, that he could get him at the patrol office. He admitted that defendant did cry while he was in that hour and a half or two hour conversation, but he does not remember at what particular stage of the talk he began to cry. He said his arm was still swollen and the defendant had complained of pain. White denied having made any promise or stating anything in regard to the other case where the Negro boy had been early released. White went back to Pell City, conferred with the county law enforcement officers, and with the circuit solicitor, and came back to Birmingham with them that same afternoon, about 5 o'clock, when the confession, which was offered in evidence, was signed. He had the written statement that he had procured that morning with him; that he merely asked the defendant if he wanted to tell them the same story he had told him that morning.

White denied that he made any promise or any inducement offered that it would be better for him to make the confession. It must be conceded, however, that the slip of paper with his name, style of his office and phone number did add some confirmation to what the defendant had stated. We are persuaded from a reading of this record that White by his method of approach to this defendant in this hour of stress gained the defendant's confidence and made him feel that in him he had a real friend, someone to whom he could look in the hour of danger.

■■■■ The defendant's testimony is to the effect that what he told the four in the afternoon was but a result of his conversation with White that morning. Of course, under our authorities the mere fact that a confession is made to an officer of the law, nor the fact that the defendant while under arrest makes a confession in answering questions put to him by the officer having him in custody, does not render the confession inadmissible. The question to be decided by the trial court in every case is whether upon the consideration of all circumstances the confession had been induced by fear or hope of favor. In Lester v. State, 170 Ala. 36, 54 So. 175, 176, the holding was that even assuming that the sheriff did not say to the prisoner "that 'it would be better for him to own up'" in so many words, yet if the question put to the prisoner, in connection with the circumstances noted, amounted to an invitation to confess or a challenge to deny, and operated to create some hope of favor or fear of harm if he might confess or deny, the confession could not be said to be a voluntary confession of the defendant, and should have been excluded. The rule is well established that where a confession has been obtained, or inducement held out, under circumstances which would render a confession inadmissible, a confession subsequently made is not admissible in evidence, unless, from proper warning of the consequences, or from other circumstances, there is reason to presume that the hope or fear, which influenced the first confession, is dispelled. And in the absence of any such circumstances the influence of the motives proved to have been offered will be presumed to continue, and to have produced the confession, unless the contrary is shown by clear evidence; and the confession will be rejected. Speaking to the same question, this court in Porter v. State, 55 Ala. 95, observed that the inquiry, in all such cases, presents itself, has all influence been withdrawn and obliterated from the mind of the prisoner, so as to show, affirmatively, that the confession is clearly voluntary, and not influenced in the slightest degree by the threats, promises, or other inducements, previously made or held out, or by any thing which resulted from previous threats or promises? For, if such previous inducements were the remote or contributory cause of the confession, the policy of the law forbids that such confession shall be used in evidence; and when previous inducements have resulted in drawing a confession, the proof should be very clear and

strong, that the mind of the prisoner had been completely disabused, so as to convince the court that the confession was as free as if no motives to make it had ever been offered to the prisoner. Less than this falls short of proving that the confession was voluntary. We applied this principle in a more recent case of Palmore v. State, 244 Ala. 227, 12 So.2d 854, where Porter v. State, supra, together with other authorities was approvingly cited. Many of our authorities touching the question of voluntary confessions are to be found cited in the still more recent cases of Phillips v. State, 248 Ala. 510, 28 So.2d 542, and Johnson v. State, 242 Ala. 278, 5 So.2d 632.

But in viewing this matter of voluntary confessions this court must pay heed to the decisions of the United States Supreme Court concerning the admission of confessions where that court under the facts concludes that the confessions so utilized fail to afford the safeguard of that due process of law guaranteed by the Fourteenth Amendment. We have read numerous authorities by that court touching this question, including Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716; Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682; Canty v. Alabama, 309 U.S. 629, 60 S. Ct. 612, 84 L.Ed. 988; White v. Texas, 309 U.S. 631, 60 S.Ct. 706, 84 L.Ed. 989, 310 U.S. 530, 60 S.Ct. 1032, 84 L.Ed. 1342; Lomax v. Texas, 313 U.S. 544, 61 S.Ct. 956, 85 L.Ed. 1511; Vernon v. Alabama, 313 U.S. 547, 61 S.Ct. 1092, 85 L.Ed. 1513; Ward v. Texas, 316 U.S. 547, 62 S.Ct. 1139, 86 L.Ed. 1663; Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; Lyons v. Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481; Lee v. Mississippi, 68 S.Ct. 300; Haley v. Ohio, 68 S.Ct. 302. A careful study of these cases is persuasive that the conclusion here reached is not only in entire harmony with the rules of the Supreme Court of the United States in questions of this character, but is dictated thereby.

In the instant case there was no pretense that any influence exerted by White in his visit in the morning of May 1st or any influence of the terrifying experience of the night before, had been obliterated, and it is clear enough that its presumed continuance is entirely justified.

Apart from the confession, the evidence for defendant's guilt was wholly circumstantial and following in the lead of Palmore v. State, supra, we find no necessity to make comments upon its probative force. The confession was improperly admitted and the ruling of the court in this respect is error to reverse. Let the judgment be reversed and the cause remanded.

Reversed and remanded.

All the Justices concur.