471 So.2d 463 (1985)
Ex parte James Harvey CALLAHAN.
(In re James Harvey Callahan v. State of Alabama).
82-1172.
Supreme Court of Alabama.
February 8, 1985.
Rehearing Denied April 5, 1985.
Fred Ray Lybrand, Wilford J. Lane and John Thomason, Anniston, for petitioner.
Charles A. Graddick, Atty. Gen., and Edward Carnes and William D. Little, Asst. Attys. Gen., for respondent.
PER CURIAM.
A writ of certiorari was granted to the Court of Criminal Appeals to review the *464 death penalty judgment, pursuant to Code 1975, § 12-22-150, and Rule 39, A.R.A.P.
Our primary concern is whether certain inculpatory statements made by the Petitioner were properly admitted into evidence. The Attorney General asks this Court to overrule Cagle v. State, 45 Ala. App. 3, 221 So.2d 119, cert. denied, 284 Ala. 727, 221 So.2d 121 (1969), and properly states the Petitioner's contention as follows:
"Petitioner urge[s] the Court to hold inadmissible his statement to law enforcement officials made February 24, 1982. The Petitioner's theory was that the statement was based upon an earlier statement made February 23, 1982, and that the State did not sufficiently prove that the specific warnings required by Miranda v. Arizona, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), were given to the Petitioner prior to the earlier statement; hence the allegedly inadmissible earlier statement tainted the later statement."
The Petitioner made two separate incriminating statements, the first on February 23, 1982, and the second on February 24, 1982. Concededly, the initial statement was not prefaced by appropriate Miranda warnings. The State contends that, because the confession of February 24 (the one admitted into evidence) was predicated upon a valid Miranda warning, the burden shifted to the defendant to show the specifics of those Miranda rights not read or stated to him before the February 23 confession.
The proper questions for resolution are whether a second confession obtained after a proper Miranda warning was given is rendered inadmissible if it is the progeny of a previous illegally elicited confession, and who has the burden of showing that the second confession was or was not illegally tainted by the first.
Extrajudicial confessions are prima facie involuntary and inadmissible, and the burden is on the State to prove that the confession was made voluntarily, C. Gamble, McElroy's Alabama Evidence, § 200.02(1) (3d ed. 1977). The cases which support this ancient proposition are legion and are collected in 6 Ala.Digest Criminal Law, Key Numbers 516, 517, 517.1, 519.
After the decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the State is required to lay two predicates before a confession is admissible. The first predicate requires a showing of voluntariness, i.e., absence of coercion or offer of reward, etc., and the second requires the State to prove that a proper Miranda warning, i.e., the right to remain silent and the right of counsel, etc., was given prior to any questioning by the police.
As Cagle v. State, 45 Ala.App. 3, 221 So.2d 119, cert. denied, 284 Ala. 727, 221 So.2d 121 (1969), points out, the precise question before us was decided by the United States Supreme Court in Westover v. United States, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Westover decision, incidentally, is incorporated in the Miranda decision, supra.
"At the time the FBI agents began questioning Westover, he had been in custody for over 14 hours and had been interrogated at length during that period. The FBI interrogation began immediately upon the conclusion of the interrogation by Kansas City police and was conducted in local police headquarters. Although the two law enforcement authorities are legally distinct and the crimes for which they interrogated Westover were different, the impact on him was that of a continuous period of questioning. There is no evidence of any warning given prior to the FBI interrogation nor is there any evidence of an articulated waiver of rights after the FBI commenced its interrogation. The record simply shows that the defendant did in fact confess a short time after being turned over to the FBI following interrogation by local police. Despite the fact that the FBI agents gave warnings at the outset of their interview, from Westover's point of view the warnings came *465 at the end of the interrogation process. In these circumstances an intelligent waiver of constitutional rights cannot be assumed.
"We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police stationin the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege."
Id., 384 U.S. at 495-497, 86 S.Ct. at 1638-1640.
The Court held that it could not find that Westover, prior to the time he made the second statement, knowingly and intelligently waived his right to remain silent and his right to consult with counsel.
The Miranda decision makes it abundantly clear that a heavy burden rests on the state to show a waiver of a constitutional right:
"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 1764 [n. 14], 12 L.Ed.2d 977. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we reassert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.
"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962), is applicable here:
"`Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' " Id., 384 U.S. at 475, 86 S.Ct. at 1628.
In Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the United States Supreme Court was concerned with what effect to give the evidentiary exclusionary rule where narcotics were discovered as a result of illegally induced declarations of a co-defendant. In that regard the Court observed:
"We now consider whether the exclusion of Toy's declarations requires also the exclusion of the narcotics taken from Yee, to which those declarations led the police. The prosecutor candidly told the trial court that `we wouldn't have found those drugs except that Mr. Toy helped us to.' Hence this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence `from an independent source,' Silverthorne *466 Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319; nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has `become so attentuated as to dissipate the taint.' Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307. We need not hold that all evidence is `fruit of a poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is `whether, granting establishment of the primary illegality, the evidence of which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959). We think it clear that the narcotics were `come at by the exploitation of that illegality' and hence that they may not be used against Toy."
Id., 371 U.S. at 487-488, 83 S.Ct. at 417-418.
While it may be argued that Wong Sun is not exactly in point, it is nevertheless instructive as to what the considerations of a court must be in deciding the admissibility of evidence which was gained in part or totally by exploitation of previous illegal conduct. In this regard, however, the Court stated:
"Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence. Either in terms of deterring lawless conduct by federal officers, Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233, or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction."
Id., 371 U.S. at 486, 83 S.Ct. at 416.
Actually, the fundamental principle which we address in this case was decided by this Court prior to the Miranda decision. In Huntley v. State, 250 Ala. 303, 34 So.2d 216 (1948), Chief Justice Gardner wrote:
"The rule is well established that where a confession has been obtained, or inducement held out, under circumstances which would render a confession inadmissible, a confession subsequently made is not admissible in evidence, unless, from proper warning of the consequences, or from other circumstances, there is reason to presume that the hope or fear, which influenced the first confession, is dispelled. And in the absence of any such circumstances the influence of the motives proved to have been offered will be presumed to continue, and to have produced the confession, unless the contrary is shown by clear evidence; and the confession will be rejected. Speaking to the same question, this court in Porter v. State, 55 Ala. 95, observed that the inquiry, in all such cases, presents itself, has all influence been withdrawn and obliterated from the mind of the prisoner, so as to show, affirmatively, that the confession is clearly voluntary, and not influenced in the slightest degree by the threats, promises, or other inducements, previously made or held out, or by anything which resulted from previous threats or promises? For, if such previous inducements were the remote or contributory cause of confession, the policy of the law forbids that such confession shall be used in evidence; and when previous inducements have resulted in drawing a confession, the proof should be very clear and strong, that the mind of the prisoner had been completely disabused, so as to convince the court that the confession was as free as if no motives to make it had ever been offered to the prisoner. Less than this falls short of proving that the confession was voluntary."
Id., 250 Ala. at 306-307, 34 So.2d at 219-220.
Our review of the decisions of the federal courts shows that they uniformly follow *467 this rule. The following is a typical statement:
"The circumstances surrounding a prior illegal confession may in some cases carry over and taint a subsequent confession, thereby rendering it inadmissible, even if the accused has been advised of his Miranda rights prior to the second confession. In order for this causal chain to be severed, the second confession must be sufficiently an act of free will to purge the primary taint."
United States v. Lee, 699 F.2d 466, 468 (9th Cir.1982) (citations omitted).
See also, e.g., Fisher v. Scafati, 439 F.2d 307 (1st Cir.1971), cert. denied, 403 U.S. 939, 91 S.Ct. 2256, 29 L.Ed.2d 719 (1971); United States ex rel. Hughes v. McMann, 405 F.2d 773 (2d Cir.1968); United States v. Nash, 563 F.2d 1166 (5th Cir.1977); Gilpin v. United States, 415 F.2d 638 (5th Cir.1969); Holleman v. Duckworth, 700 F.2d 391 (7th Cir. 1983); Evans v. United States, 375 F.2d 355 (8th Cir.1967), rev'd sub. nom. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), appeal after remand, 416 F.2d 310 (1969), cert. denied, 397 U.S. 1014, 90 S.Ct. 1248, 25 L.Ed.2d 428 (1970); United States v. Robinson, 439 F.2d 553, 142 U.S.App. D.C. 43 (D.C.Cir.1970).
It is then clear that Cagle, supra, and Swicegood v. State, 50 Ala.App. 105, 277 So.2d 380 (1973), have a solid foundation in constitutional law and are hereby affirmed. Indeed, to attempt to overrule these cases would be but an effort to overrule the United States Supreme Court, a power which does not reside with this Court.
The judgment of the Court of Criminal Appeals, 471 So.2d 447, is reversed and the cause remanded with instructions to remand to the circuit court for a new trial.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
EMBRY, J., dissents with opinion in which FAULKNER, J., joins.
EMBRY, Justice (dissenting):
I will address the issue raised by the petitioner with respect to part eight of the opinion of the Court of Criminal Appeals. By way of letter brief, requested by this court following oral argument, the State aptly poses the issue here presented:
"Petitioner urge[s] the Court to hold inadmissible his statement to law enforcement officials made February 24, 1982. The Petitioner's theory was that the statement was based upon an earlier statement made February 23, 1982, and that the State did not sufficiently prove that the specific warnings required by Miranda v. Arizona, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), were given to the Petitioner prior to the earlier statement; hence the allegedly inadmissible earlier statement tainted the later statement."
The State's brief continues:
"The Petitioner base[s] his argument partially upon the doctrine of Swicegood v. State, 50 Ala.App. 105, 277 So.2d 380 (1973). In Swicegood a police officer's testimony that he read the defendant his rights, without elaboration of what those rights consisted of, was not sufficient to lay the Miranda predicate. The testimony here is somewhat similar. Although the Alabama Court of Criminal Appeals has applied Swicegood's holding several times; Robinson v. State, 399 So.2d 902 (Ala.Crim.App.1978 [1981]); Thomas v. State, 370 So.2d 1066 (Ala.Crim.App. 1978); writ quashed, 370 So.2d 1070 (Ala.1979); Kelly [Kelley] v. State, 366 So.2d 1145 (Ala.Crim.App.1979), this Court has apparently never ruled upon this doctrine. Swicegood and its progeny should be overruled."
At the expense of repetition, this case presents a situation where the petitioner made two separate incriminating statements, the first on 23 February 1982, the latter on 24 February 1982. Concededly, the initial statement was not prefaced by appropriate Miranda formalities. Likewise, *468 there is no question that the later statement was properly predicated pursuant to the guidelines of Miranda. Against this backdrop, petitioner argues that the initial deficiency, enveloping his 23 February statement, taints, and thus renders inadmissible into evidence, any confession he may have made on 24 February. See Swicegood, supra; and Cagle v. State, 45 Ala. App. 3, 221 So.2d 119 (1969). I do not agree.
In effect, the State contends that, because the confession of 24 February (the one admitted into evidence) was predicated upon a valid Miranda warning, the burden shifted to the defendant to show the specifics of those Miranda rights not read or stated to him before the 23 February confession was given by him. To the extent Swicegood, Cagle, and subsequent cases hold otherwise, I would overrule those cases in that regard.
FAULKNER, J., concurs.

ON APPLICATION FOR REHEARING
PER CURIAM.
In its brief on application for rehearing, the State takes us to task for misconstruing its argument. It asserts that the first issue is whether the State sufficiently proved that the "first" confession on February 23 was preceded by adequate Miranda warnings. If not, says the State, there arises the second issue of whether the State met its burden of proving that the "second" confession of February 24, admitted into evidence, was sufficiently remote from the earlier confession so as to remove the taint of the improperly elicited confession. After the State filed its application for rehearing, the United States Supreme Court announced its decision in Oregon v. Elstad, ___ U.S. ___, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). That decision makes it relevant whether the initial questioning is "uncoercive."
The parties originally presented the issues in a narrow fashion which led this Court to take as fact the existence of only two confessions. In truth, there was not one "first" confession on the 23rd as to which there was some evidence of a prior Miranda warning; Callahan gave several statements during the course of persistent questioning on the 22nd and the 23rd. Even the district attorney admitted this during voir dire testimony concerning the admissibility of any of the alleged statements:
"Judge, I would like for the record to show that the State has not attempted to offer into evidence any of the four statements alluded to by [Callahan's attorney]. Any statements taken on Tuesday or any statements taken on Wednesday, the 22nd or the 23rd. A lot of the questioning has been in regard to those statements and for the purposes of the record, we would like it to be clearly indicated that the State has not offered any of those statements into evidence."
Reporter's Transcript, p. 265 (emphasis added). Furthermore, in complying with a discovery order, the State notified the court that it had given Callahan a copy of a written statement he had signed on the 22nd.
The State never did offer any of these prior statements nor seek to prove that Callahan was given any Miranda warnings on the 22nd. The only arresting officer who testified said unequivocally that Callahan was not given any Miranda warnings when he was arrested. The only testimony regarding Miranda warnings given to Callahan on the 23rd prior to the statements made on that day was the following by an assistant district attorney:
"Q. When did this questioning period begin, Mr. Hubbard?
"A. On the 23rd, if I'm not mistaken, it was sometime in the mid afternoon or possibly early afternoon. I had seen Mr. Callahan that morning but we didn't go into any detail questioning, at that time.
"Q. Was anyone else with you when you saw him that morning?
"A. I know the same persons that I have already mentioned were present *469 and I said there may be other persons that were present as well as
"Q. Were you asking him questions that morning?
"A. I'm sure we asked him some questions; yes, sir.
"Q. Okay, and how long were you questioning him that morning?
"A. I don't remember the exact length of time. I know that I went down that morning probably around nine o'clock or so and I don't think there was any formalized questioning of Mr. Callahan, though. We did go to the trailer where Mr. Callahan had formerly lived that morning.
"Q. There was no formal questioning of him?
"A. Yes, sir; I'm sure when we read him his rights and we probably asked him some questions. As far as any written statements being taken down, I'm not aware of any.
"Q. You said you were sure you read him his rights; who was present when you read him his rights?
"A. The same people I just mentioned.
"Q. Did you make any record of that?
"A. I know that they had a waiver signed; yes, sir."
The only waiver which the State offered was signed at 12:07 p.m. on February 24.
The State argues that this Court should overrule Swicegood v. State, 50 Ala.App. 105, 277 So.2d 380 (1973), and a series of Court of Criminal Appeals cases following it, including Thomas v. State, 370 So.2d 1066 (Ala.Crim.App.1978), writ quashed, 370 So.2d 1070 (Ala.1979). The Court of Criminal Appeals in Swicegood held that a generalized statement that "we read him his rights" is not a sufficient predicate for the introduction of a confession. The State now asks us to hold that such a showing is prima facie sufficient and shifts the burden to the defendant to show that the State did not give some of the specific warnings required for a voluntary, informed confession.
The State's argument begs the question. The State made no showing of any warnings given on the 22nd, and the series of questioning and statements is essentially continuous.
Callahan was arrested at 5:00 a.m. on February 22. He was questioned all that day and at least off and on during the 23rd. Callahan sought to introduce testimony that he had not slept and that the deputies would not let him eat and otherwise coerced him into giving information on the 22nd and 23rd. Information which Callahan gave during this period was incorporated into a consent form which the D.A. prepared on the 24th and Callahan signed on that date. This consent form and the accompanying waiver of right to counsel led directly to the confession on the afternoon of the 24th which the trial court admitted into evidence.
On the afternoon of the 23rd, attorney Fred Ray Lybrand came to the jail at the request of Callahan's father. The deputies would not let Lybrand see Callahan until Lybrand got Judge Monk to come to the jail. Judge Monk went into the room where the deputies were questioning Callahan. Judge Monk stated for the record that he "basically advised [Callahan] of his Miranda rights and he [Callahan] stated that he wished to speak with Mr. Lybrand." Callahan spoke with Lybrand and the deputies did not question him further that day.
On the morning of the 24th, Lybrand told the D.A. that he could not represent Callahan because of his connections with the victim's family. The deputies testified that, later that morning, Callahan sent word that he wanted to talk to them. At 12:07 p.m. he signed a waiver of counsel (Ex. 13), and a "consent" form (Ex. 12), agreeing "to accompany Deputy Sheriff M.L. Kirby and other law enforcement officers to the area or place I believe Becky Howell's boots, socks and other items of clothing may be located." The sheriff proceeded to take Callahan to the scene of the crime and other places to which Callahan directed him.
*470 During this time on the afternoon of the 24th, Callahan's present counsel, Wilford J. Lane, came to the sheriff's office and tried to inform the sheriff that he was representing Callahan. A deputy told Lane that the sheriff had taken Callahan away from the jail but would not say where. He apparently made a perfunctory attempt to call the sheriff on the radio and told Lane he was unable to reach the sheriff. The two occasions on which the deputies were reluctant to help Callahan's attorneys reach him, and the apparent failure to tell him that his initial counsel had withdrawn, raise questions not only of a coercive atmosphere of the questioning but also of a possible infringement of Callahan's 6th Amendment right to assistance of counsel. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).
During the questioning which occurred before Judge Monk advised him of his Miranda rights on the 23rd, Callahan had told the deputies about throwing the victim's boots out of his truck. Thus the consent form shows on its face that it is tainted by the prior testimony. Callahan's attorney objected to the testimony about his leading the sheriff on the search pursuant to the consent form on the ground that it was tainted, but the court merely ruled that because Lybrand withdrew on the morning of the 24th, any statement taken after that was not in violation of Callahan's right to counsel.
After extensive continued voir dire, the court ruled that Callahan signed the waiver and consent forms voluntarily. The sheriff proceeded to testify how Callahan, shortly after signing the waiver and consent, took him to the scene of the kidnapping and led him through the various steps of the crime. Thus, there was admitted over objection evidence which came about as a direct result of the waiver and consent as to which the State did not meet its burden of showing that it was not tainted by the prior illegally obtained confessions.
Oregon v. Elstad, supra, explicitly addresses only the situation where the initial confession occurs under uncoercive circumstances. In that case, the arresting officers went to Elstad's house with a warrant for his arrest. While one officer was talking to Elstad's mother in another room, another officer asked him three questions, to which he responded, admitting that he had participated in the burglary for which he was being arrested. Later, at the police station and after proper Miranda warnings, he waived his right to remain silent and candidly admitted his participation in the burglary. The United States Supreme Court held that the Fifth Amendment of the United States Constitution did not require the exclusion of the subsequent confession from evidence, because both the first and second confessions were given voluntarily.
The situation here is quite different. The police questioned Callahan intensively for two days before he confessed on the third day. Apparently he initially denied knowledge of the crime, and even after confessing to being with the victim, he maintained that he had not killed her. The officers took a signed confession on the 22nd and 117 pages of stenographically-recorded confessions on the 23rd, but did not seek to introduce any of this material.
Over and above the inevitable coercive atmosphere of such questioning, Callahan testified on voir dire that his interrogators threatened him with their guns and fists, although the officers denied this. He made a telephone call to his father, but the attorney whom his father sent only reached him with the help of the circuit judge. Notwithstanding any dispute in the testimony as to what actually took place during the questioning, the operative facts of this three-day questioning in the police station are sufficient to distinguish this case from Elstad. We certainly cannot say from this record that this questioning was uncoercive within the meaning of Elstad or that it did not impermissibly taint the later confession which the trial court admitted into evidence.
As the cases discussed in the original opinion establish, the burden is on the State to show the proper predicates for the *471 admission of an extra-judicial confession: lack of coercion, proper Miranda warnings, etc. The State also has the burden of showing that a subsequent, properly taken confession was not tainted by a prior, improperly taken confession. The record must affirmatively show that these burdens have been met. The record in this case does not come close to showing that the State has met its burden. Oregon v. Elstad lowers the State's burden, but it does not eliminate it.
OPINION EXTENDED; APPLICATION OVERRULED.
TORBERT, C.J., and JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
FAULKNER and EMBRY, JJ., dissent.
MADDOX, J., dissents with opinion.
MADDOX, Justice (dissenting):
On original deliverance I concurred in the majority opinion, but became convinced, on application for rehearing, even before the Supreme Court of the United States decided Oregon v. Elstad, ___ U.S. ___, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), that the majority opinion was incorrect. I came to this conclusion based upon my further review of the record, which showed, in my judgment, that the confession which was admitted into evidence was not tainted in any way by any police conduct which preceded the defendant's making it. After studying Elstad, I am convinced more than ever that the State's application for rehearing should be granted.
Although I recognize the limited scope of Elstad, I nevertheless believe that the rule of law set forth in that opinion is applicable to the facts of this case. In Elstad, the Court held:
"When police ask questions of a suspect in custody without administering the required warnings, Miranda dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief. The Court has carefully adhered to this principle, permitting a narrow exception only where pressing public safety concerns demanded. See New York v. Quarles, 467 U.S. [___] at ___ [104 S.Ct. 2626, ___, 81 L.Ed.2d 550 (1984)]. The Court today in no way retreats from the bright line rule of Miranda. We do not imply that good faith excuses a failure to administer Miranda warnings; nor do we condone inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him. A handful of courts has, however, applied our precedents relating to confessions obtained under coercive circumstances to situations involving wholly voluntary admissions, requiring a passage of time or break in events before a second, fully warned statement can be deemed voluntary. Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary.5 The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative."
5 "JUSTICE BRENNAN, with an apocalyptic tone, heralds this opinion as dealing `a crippling blow to Miranda.' ... JUSTICE BRENNAN not only distorts the reasoning and holding of our decision, but, worse, invites trial courts and prosecutors to do the same." (Emphasis added.)
The majority discusses the effect of Elstad, and distinguishes it, as I understand the majority's opinion, on the ground that the facts of this case are substantially different from those in Elstad, and that here the State failed to meet its burden of showing that the prior statements made by Callahan *472 were free and voluntary. I cannot agree with this conclusion. As the majority admits, there was extensive voir dire, after which the court ruled that Callahan signed the waiver and consent forms voluntarily. (Emphasis added.) The actual finding by the court was as follows:
"THE COURT: All right, I don't find any substantial credible evidence that the Defendant was in any way abused or threatened or denied access to a telephonedenied communications to anyone that he wished to communicate with or that he was in any way forced to sign the two exhibits that are in issue; State's Exhibits Twelve and Thirteen. From what's been presented I find that he did so voluntarily and apparently in full understanding and knowledge of his rights.
"All right, let's bring the jury down." (Emphasis added.)
Admittedly, there was testimony, if believed, which would have supported his theory that the statements which he made on the 22nd and 23rd were not only inculpatory, but were also involuntary. On the other hand, there was testimony which showed, as the majority states in the extension of the original opinion, that Callahan "initially denied knowledge of the crime, and even after confessing to being with the victim, he maintained that he had not killed her." (Emphasis added.) Furthermore, the record shows, and the majority admits, that "[t]he deputies testified that, later that morning [the 24th], Callahan sent word that he wanted to talk to them." (Emphasis added.)
The relevant inquiry, as I view it, is: Was the confession made on the 24th voluntary, or was it tainted by the prior statements made by Callahan on the 22nd and 23rd? The rule of law in such circumstances is set out in Elstad.
In Elstad, a majority of the Supreme Court held that "The relevant inquiry is whether, in fact, [a] second statement [the one admitted into evidence here] was ... voluntarily made," and that "[a]s in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." In Elstad, the Court added that "[t]he fact that a suspect chooses to speak after being informed of his rights, is, of course, highly probative."
Here, the trial court did "examine the surrounding circumstances and the entire course of police conduct with respect to [Callahan] in evaluating the voluntariness of his statements," and concluded that they were voluntarily made. I would affirm his finding of fact. There is no question that the conduct and confession made by Callahan on the 24th were voluntary, and the court could have found that Callahan initiated the action which led to his signing of the consent form and the confession on the 24th. Furthermore, the trial court was authorized to find that Callahan chose to speak after being advised of his rights. This fact was "highly probative." Elstad.
The majority examines the surrounding circumstances and the entire course of police conduct with respect to Callahan and finds that it was coercive. Of course, I disagree with that finding, because I believe that the trial judge was authorized to find, as he did, that there was not "any substantial credible evidence that the defendant was in any way abused or threatened or denied access to a telephonedenied communications to anyone that he wished to communicate with or that he was in any way forced to sign the two exhibits that are in issue...." (Emphasis added.)
Apparently, the majority feels that under the facts shown in the record, the police conduct here was "inherently coercive" and undermined Callahan's will to invoke his rights once they were read to him. I cannot say, as a matter of law, that is true. I think it was a factual question.
Consequently, I would grant the State's application for rehearing and affirm the judgment of the Court of Criminal Appeals; therefore, I respectfully dissent.