Rickey Lee Johnson was convicted in the Jefferson Circuit Court of capital murder. In a unanimous decision, the Court of Criminal Appeals affirmed Johnson's conviction and sentence. Although Johnson raises numerous issues on appeal, we find it necessary to address only three of those issues.
A detailed discussion of the facts is contained in State v.Johnson, 620 So.2d 679 (Ala.Cr.App. 1992); thus, we begin by noting only the most pertinent details from the record. Seventy-year-old Emma Whitehead was severely beaten in her house on the afternoon of June 8, 1988, sustaining numerous head injuries that contributed to her death. Ruby Brown, Whitehead's cousin and housemate, testified at trial that she came onto the scene of the attack at approximately 3:45 p.m. She walked into Whitehead's house and saw a man, whom she later identified as Johnson, standing behind the door holding an electric clothes iron. The house had been ransacked. Johnson hit Brown with the iron, knocking her off balance, and then hit her in the head with a crystal candy dish. He left the *Page 711 
room, and Brown escaped out the front door into the yard; however, Johnson overtook her and dragged her back into the house, telling her that he was going to kill her. Once inside, he grabbed a brass lamp and hit Brown with it. She then saw him grab her purse and take about $78 dollars from it. Brown asked Johnson what he had done to Whitehead, and then she began to scream for help. Johnson replied that Brown should save her energy because Whitehead was going to need her assistance. He then began to beat Brown again, demanding money. Brown pretended to lose consciousness, until Johnson went into a back room of the house. She then realized that the house was on fire, and she escaped through the front door. When the police arrived, they found Whitehead's body; it was later determined that she had died from head injuries and smoke inhalation.
In the ensuing investigation of the murder, the police arrested Johnson as a suspect. Following his arrest, Johnson gave a statement to the police, which was audiotaped. His picture was included in a photographic array shown to Brown on June 16, 1988, and he appeared before her in a line-up on July 7, 1988. Brown was unable to identify her assailant on either occasion. Immediately after the July 7 line-up, Brown went to the office of Sgt. Randy Boissel, the investigating officer on the case, to look at another group of photographs. Boissel began to locate and organize photographs of several men who spent time at a vacant house located beside Brown's home. At trial, Brown testified that a photograph of Johnson fell out of one of the photograph books and that she then identified the person pictured in that photograph as her assailant.
The first issue raised is whether the trial court erred in admitting into evidence the audiotaped statement Johnson gave to the police following his arrest. Johnson contends that that statement was involuntary and violated the principles ofMiranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966), and was thus due to be suppressed.
An in-custody statement by an accused is prima facie involuntary and inadmissible; to overcome this presumption, the State must first establish that before the defendant gave his statement the police informed him of his rights, as required byMiranda. Ex parte Callahan, 471 So.2d 463 (Ala. 1985). See, also, Swicegood v. State, 50 Ala. App. 105, 277 So.2d 380
(1973). To this end, the State must spell out with clarity and precision the specific Miranda warnings the police gave to the defendant. Swicegood.
At trial, Sgt. Boissel testified that Johnson volunteered to give a statement following his arrest and after being given aMiranda warning. Boissel testified:
 "Q. All right. Prior to having this conversation with Rickey Johnson did you read him what is commonly known as his Miranda rights?
"A. I did."
This was the extent of the State's inquiry as to exactly what the police said to Johnson concerning his Miranda rights before they took his statement. Under the principles of Swicegood, this exchange was not sufficient to establish the necessaryMiranda predicate, because the general question of whether theMiranda warnings were given does not adequately establish whether the warnings were properly given and understood by the defendant. Swicegood. See, also, Arthur v. State,575 So.2d 1165 (Ala.Crim.App. 1990), cert. denied, 575 So.2d 1191
(Ala. 1991); Robinson v. State, 399 So.2d 902
(Ala.Crim.App. 1981); and Thomas v. State, 370 So.2d 1066
(Ala.Crim.App. 1978), writ quashed, 370 So.2d 1070 (Ala. 1979). In each of those cases, the State sought to establish a Miranda predicate by merely asking the police whether the warnings were given, and this was consistently held to be inadequate underSwicegood. The Court of Criminal Appeals properly explained inThomas:
 "The simple question 'Did you read the defendant his rights as per the Miranda decision,' does not indicate whether the rights were read before or after questioning, whether the defendant understood the rights, and whether he made an *Page 712 
intelligent waiver of these rights. Even in cases where officers have attempted to give a detailed Miranda warning, key elements have been left out or misstated; thus, it is critical that the testifying officer give some detail as to exactly what language was used for the Miranda warning and under what circumstances."
370 So.2d at 1070.
In Ex parte Callahan, 471 So.2d 463 (Ala. 1985), this Court was urged to overrule Swicegood, and we specifically addressed that opinion and its progeny for the first time. After a detailed analysis of the United States Supreme Court decisions underlying Swicegood, as well as earlier Alabama cases, we concluded that Swicegood has a solid foundation in constitutional law and that any attempt to overrule it "would be but an effort to overrule the United States Supreme Court, a power which does not reside with this Court". Callahan,471 So.2d at 467. We likewise have no power to deviate fromSwicegood today.
We note that in-custody statements given by the defendant relating to purely collateral matters and not inculpatory in any respect do not fall under the principle ofSwicegood and, thus, evidence of such statements is admissible without the showing of a proper Miranda predicate. Cartwrightv. State, 469 So.2d 674 (Ala.Crim.App. 1984). Here, some of the statements contained in the audiotape are in regard to purely collateral matters and would not, standing alone, invoke the principles of Swicegood. There are other statements, however, that do connect Johnson with the crime of which he is accused. On the tape, Johnson admitted he knew that the police were looking for him to question him about Whitehead's death and about another "felony warrant" sworn out on him. He stated that he was "afraid of what they said I had done" and described how he eluded the police by going from house to house on the day after the crime. He stated that, while eluding arrest, he confessed to a friend that "I got myself into a little trouble." Johnson also described how members of his family and a friend all accused him of burning Whitehead's house. Because these statements relate to matters that are not purely collateral, evidence of them was inadmissible without a properMiranda predicate.
The State argues that even if evidence of Johnson's statements was inadmissible, its introduction into evidence was harmless error. We must recognize, however, that Johnson's statement that he had gotten himself into trouble and that he had eluded the police, as well as his statements regarding the accusations of his family and friend, were in some respects inculpatory. We cannot therefore hold that the improper admission of this evidence constituted harmless error.
Although we reverse for the reasons stated above, for the sake of judicial economy we address two other issues raised by Johnson, which are almost certain to come up again on remand for a new trial.
First, Johnson argues that the pretrial eyewitness identification procedures were unnecessarily suggestive and that the resulting identification evidence was therefore inadmissible. Pretrial identifications are to be set aside on grounds of prejudice only if the pretrial identification procedure is so suggestive as to give rise to a substantial likelihood of misidentification. Ex parte Stout, 547 So.2d 901
(Ala. 1989). The totality of the circumstances surrounding the out-of-court identification need be analyzed only when the pretrial procedures used appear to have been unnecessarily or impermissibly suggestive. Stout.
Johnson argues that because his picture was included in two photographic arrays and he appeared in a line-up before Brown identified him, the process of identification was improperly repetitive. To bolster his argument, Johnson relies onFoster v. California, 394 U.S. 440, 89 S.Ct. 1127,22 L.Ed.2d 402 (1969), wherein the United States Supreme Court held that a robbery victim's identification of the defendant was tainted because the victim had been repeatedly exposed to the defendant in pretrial identification processes. In that case, the defendant was presented to the victim *Page 713 
in a line-up, and the victim was unable to positively identify him. The victim asked for the opportunity to speak to the defendant, and he was subsequently brought in alone and seated across from her: however, the victim was still uncertain whether he was the guilty man. The police held a second line-up, and at that line-up the victim was "convinced" that the defendant was the robber. The participants in the line-ups did not bear a particular resemblance to the defendant, and the defendant was the only individual to participate in both line-ups. The Supreme Court held that by repeatedly presenting the defendant to the victim and by isolating him after the first line-up, the police "arranged" pretrial confrontations that made the resulting identification of the defendant virtually inevitable. The Court stated that, "in effect, the police repeatedly said to the witness 'This is the man,' "Foster, 394 U.S. at 443, 89 S.Ct. at 1129 (emphasis original), and concluded that this procedure so undermined the reliability of the identification process so as to violate the defendant's due process rights.
In this case, there is no indication that the police repeatedly arranged confrontations between Johnson and Brown; the mere fact that Brown was shown Johnson's picture and also saw him in the line-up does not establish any impropriety in the identification process. Under Alabama law, it is not error to have a defendant participate in both a photographic array and a line-up, even though he may be the only common participant in the two procedures. Nicholes v. State,409 So.2d 454 (Ala.Crim.App. 1981). Unlike Foster, this case presents no evidence that the defendant was ever singled out by the police or that the witness was coerced by the police to choose the defendant. Moreover, the record indicates that the individuals in the photographic array and the line-up were physically similar to Johnson. The officer in charge of choosing the individuals for the line-up testified at trial that he took special care to locate participants who resembled Johnson, so that it would be as difficult as possible for Brown to distinguish Johnson. Because these pretrial identifying procedures did not make Brown's identification of Johnson inevitable, the Court of Criminal Appeals correctly held that the pretrial identification procedures were not impermissibly suggestive and that Brown's identification testimony was properly presented to the jury for its consideration. We are not, therefore, required to further examine the totality of the circumstances to determine whether there was a substantial likelihood of misidentification.
Next, Johnson argues that the evidence does not show that he murdered Whitehead during a first-degree robbery of Brown. Johnson points out that, under Alabama law, a robbery committed as a "mere after-thought" and unrelated to the murder will not sustain a conviction for the capital offense of robbery murder, pursuant to § 13A-5-40(a)(2). He argues that the State failed to prove that his robbery of $78 from Brown was related to his murder of Whitehead and further argues that the jury was not properly instructed as to the evidentiary requirements of §13A-5-40(a)(2).
To sustain a conviction under § 13A-5-40(a)(2), the State must prove beyond reasonable doubt (1) a "robbery in the first degree or an attempt thereof," as defined by § 13A-8-41; (2) a murder as defined by § 13A-6-2(a)(1); and (3) that the murder was committed "during" the robbery or attempted robbery, i.e., that the murder was committed "in the course of or in connection with the commission of, or in the immediate flight from the commission of" the robbery or attempted robbery in the first degree. § 13A-5-39(2); Hallford v. State, 548 So.2d 526
(Ala.Cr.App. 1988), affirmed, 548 So.2d 547 (Ala.), cert.denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). The intentional killing must take place during the course of the robbery in question; however, the taking of the property of the victim need not occur before the killing. Hallford.
Moreover, the capital offense of robbery-murder encompasses a robbery-murder in which the person killed is not the person robbed. Taylor v. State, 442 So.2d 128 (Ala.Crim.App. 1983). *Page 714 
The fact that the murder victim was dead when the property was taken would not prevent a finding of robbery, if the murder and the taking of property formed a continuous chain of logically related events. Hallford. The question whether the defendant had the intent to kill at the time of the taking is usually a jury issue, and the jury may infer from the facts and circumstances that a robbery began when the accused attacked the victim and that the capital offense was consummated when the accused took the robbery victim's property and fled.Hallford.
Johnson contends that, according to the evidence, Whitehead's murder was complete before Brown arrived at the house and that the robbery of Brown was thus the result of a mere afterthought arising after Whitehead's murder. This argument is not supported by the record, which would support a finding that Whitehead's murder was not complete until after Johnson had robbed Brown. The record shows that the house was ransacked at the time Brown arrived. During the course of his attack on her, Johnson not only robbed Brown but also repeatedly demanded that she tell him where Whitehead kept her money. Johnson told Brown that Whitehead would need her assistance later, thus indicating that Whitehead was still alive at that time. Most significantly, evidence regarding Whitehead's autopsy reveals that she had a high level of carbon monoxide in her blood and sooty deposits in her lungs; from this, the jury could properly infer that Whitehead was breathing when Johnson set the house ablaze, after he had robbed Brown. The jury could further infer that Johnson intended to rob Brown when she entered the house and that Whitehead's death occurred in the course of Johnson's attempt to execute this robbery. Accordingly, we find no merit in Johnson's argument regarding the sufficiency of the evidence.
In view of the foregoing, the judgment of the Court of Criminal Appeals is reversed and this cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES, ADAMS, HOUSTON and KENNEDY, JJ., concur.