[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1114 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1115 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1116 
Billy Perez Jennings was convicted, pursuant to counts one and two of the indictment returned against him, to two counts of trafficking in marijuana, a violation of §13A-12-231(1)(a), Ala. Code 1975. He was also convicted, pursuant to count three of the indictment returned against him, to *Page 1117 
possession of marijuana in the second degree, see § 13A-12-214, Ala. Code 1975, as a lesser-included offense of possession of marijuana in the first degree. On October 29, 2004, he was sentenced, as a habitual offender with one prior felony conviction, to 22 years in prison for each trafficking conviction. Jennings was sentenced to 12 months in jail for the misdemeanor conviction of second-degree possession of marijuana. All three sentences were to run concurrently. For each trafficking conviction, Jennings was ordered to pay the accompanying $25,000 trafficking fine and $2,000 pursuant to the Demand Reduction Assessment Act. Jennings was further ordered to pay $100 to the Forensic Services Trust Fund for each of his three convictions. On November 23, 2004, Jennings filed a motion for a new trial, which the trial court denied following a hearing on December 22, 2004. This appeal followed.
The evidence at trial indicated that members of the West Alabama Narcotics Task Force, acting on information provided by an informant, conducted an operation in December 2002 to purchase an amount of marijuana from Margarito Gonzalez at Los Garcias Garage. The informant, Kelly Douglass, spoke with Gonzalez, who advised him to come back in approximately 20 minutes because the marijuana was at a nearby location and Gonzalez had to go get it. Surveillance indicated that Gonzalez followed a white truck to a residence on Riggs Road and that Gonzalez then returned to the garage. Officer Brian Oswalt testified that he observed the scene from a helicopter. According to Officer Oswalt, he saw a white truck arrive at the garage and a few minutes later the white truck left the garage followed by another truck that had already been parked at the garage. Officer Oswalt further stated that he followed the trucks to a residence on Riggs Road, where he saw two individuals get out of the trucks and enter the residence. Finally, Officer Oswalt testified that he saw one of the men leave the house and get back into the truck, at which time, according to Officer Oswalt, the truck drove back to the garage.
Surveillance further indicated that Gonzalez then sold approximately 4 1/2 pounds of marijuana to Douglass. Agent Wayne Robertson testified that Gonzalez was arrested and that he told police that Jennings was driving the white truck. Additional testimony indicated that Jennings had been in the white truck at various times that day.
Officers executed a search warrant on the Riggs Road residence where they located, among other items, Ziploc brand plastic bags, a marijuana cigarette, and a bag containing approximately one quarter of a pound of marijuana. Isaiah Hall, Jr., and Luis Jennings were present at the time of the search. Luis Jennings indicated that Billy Jennings had been in the white truck that day.
Hall led officers to a residence at 3430 Sage Drive and informed the officers that there was a large quantity of marijuana at that location. Officers obtained and executed a search warrant for that residence, which was later determined to be the residence of Christopher Knox. At Knox's Sage Drive residence officers discovered, among other things, packing material with marijuana residue inside a garbage can, marijuana inside a barbeque grill, marijuana in a blue truck, marijuana in a storage shed, and a black duffel bag containing nine "bricks" of marijuana in a bedroom; the testimony indicated that the packing material found in the garbage can was similar to the packing material on the marijuana bricks in the duffel bag. In all, officers discovered approximately 129 pounds of marijuana at Knox's residence. *Page 1118 
Knox was not present when officers searched his home, but he later contacted Agent Robertson. After speaking with Agent Robertson and setting up a plea agreement, Knox implicated Jennings, who was Knox's next-door neighbor. According to Knox, Jennings approached him in April 2002 about finding a source from which they could purchase a large quantity of marijuana; Knox stated that he understood that Jennings intended to sell the drugs. Knox testified that he contacted a family friend in Texas about purchasing marijuana and that he did not hear anything until December 2002.[1] Knox stated that someone called him in December 2002 and advised him that the drugs were coming. According to Knox, he informed Jennings that the drugs were en route. Knox stated that when the drug couriers arrived with approximately 14-16 bricks of marijuana in two black duffel bags, he asked Jennings to come to his house. According to Knox, because neither he nor Jennings had the money to pay for the drugs, the couriers left, telling Knox and Jennings that they would be back that weekend to pick up their money and whatever drugs had not been sold. Knox stated that he and Jennings cut a few bricks of marijuana open and threw the packing material in the trash can. Knox further testified that Jennings went to the store and bought gallon-sized Ziploc bags in which they repackaged some of the marijuana. According to Knox, Jennings took some of the marijuana with him when he left; Knox stated that officers executed the search warrant on his house two days after the marijuana arrived. According to Knox, Jennings promised to pay him $3,000 for his part in obtaining the marijuana.
Jennings's fingerprints were found on some of the plastic bags in which marijuana was found in the barbeque grill at Knox's residence. The testimony further indicated that the marijuana purchased from Gonzalez during the controlled drug buy was packaged in the same size and brand of bags as the bags on which Jennings's fingerprints were discovered. Finally, a small amount of marijuana and a set of digital scales were found at Jennings's house at the time of his arrest.
 I.
Jennings first argues that he was denied a fair trial because of what he contends was the State's failure to provide timely discovery of evidence. More specifically, Jennings argues that the prosecutor failed to timely disclose fingerprint evidence, including the plastic bags or photographs of the plastic bags on which Jennings's fingerprints were discovered and photographs and negative strips of latent prints; the certificate of analysis of the marijuana Gonzalez sold to Douglass; a photograph of Jennings that had been shown, before trial, to the witness who identified Jennings at trial; recorded statements of two of his alleged accomplices; complete and accurate details of the State's agreement with Knox, who was going to testify as a witness for the State; and complete and accurate reports of the State's fingerprint experts.
The argument section of Jennings's brief on this issue is approximately 42 pages long. In that argument, Jennings citesPeal v. State, 491 So.2d 991, 1001 (Ala.Crim.App. 1985), for the proposition that "[t]he phrase `justice by ambush' aptly applies to the trial of Mr. Jennings, a trial *Page 1119 
which was poisoned by the failure of the State of Alabama to timely disclose all discoverable information." (Jennings's brief at p. 12.) Jennings further avers that his "ability to prepare for trial was significantly hampered by the untimely disclosures." (Jennings's brief at p. 13.) Jennings explains, in some detail, the efforts he undertook and motions he filed in the circuit court in his attempts to obtain discoverable evidence in a timely manner; the explanations offered by the State for the timing of its disclosure of certain information to the defense; discrepancies in some of the materials eventually provided and testimony or other materials previously provided during discovery; and the trial court's rulings on discovery matters. (Jennings's brief at p. 13-36.) Jennings further argued that the prosecutor had a duty to comply with the trial court's discovery orders; to learn of discoverable evidence known to those acting on behalf of the State; to not use false evidence or allow it to be used; and to provide the defense with the correct terms of any agreements with witnesses for the State.
Initially, we note that, to the extent that Jennings contends he was entitled to relief pursuant to Brady v.Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
(1963), he neither argues, nor does our review of the record indicate, that any of the evidence involved in the alleged discovery violations was exculpatory.
Rule 16.1, Ala.R.Crim.P., provides, in relevant part:
 "(b) Statements of Co-defendant or Accomplice. Upon written request of the defendant, the prosecutor shall, within fourteen (14) days after the request has been filed in court . . .:
 "(1) Permit the defendant to inspect and to copy any written or recorded statements made by a co-defendant or accomplice to any law enforcement officer, official, or employee, which are within the possession, custody, or control of the state/municipality, the existence of which is known to the prosecutor and which the state/municipality intends to offer in evidence at the trial; and
 "(2) Disclose the substance of any oral statements made by any such co-defendant or accomplice, before or after arrest, to any law enforcement officer, official, or employee which the state/municipality intends to offer in evidence at the trial.
 "(c) Documents and Tangible Objects. Upon written request of the defendant, the prosecutor shall, within fourteen (14) days after the request has been filed in court . . . permit the defendant to analyze, inspect, and copy or photograph books, papers, documents, photographs, tangible objects, controlled substances, buildings or places, or portions of any of these things, which are within the possession, custody, or control of the state/municipality and:
 "(1) Which are material to the preparation of defendant's defense; provided, however, that the defendant shall not be permitted to discover or to inspect reports, memoranda, witness lists, or other internal state/municipality documents made by the prosecutor or the prosecutor's agents, or by law enforcement agents in connection with the investigation or prosecution of the case, or statements made by state/municipality witnesses or prospective state/municipality witnesses;
 "(2) Which are intended for use by the state/municipality as evidence at the trial; or
 "(3) Which were obtained from or belong to the defendant.
 ". . . . *Page 1120 
 "(d) Reports of Examinations and Tests. Upon written request of the defendant, the prosecutor shall, within fourteen (14) days after the request has been filed in court . . . permit the defendant to inspect and to copy any results or reports of physical or mental examinations or scientific tests or experiments, if the examinations, tests, or experiments were made in connection with the particular case, and the results or reports are within the possession, custody, or control of the state/municipality, and their existence is known to the prosecutor."
Rule 16.3, Ala.R.Crim.P., provides a continuing duty to disclose evidence where, "[i]f prior to or during trial a party discovers additional evidence or decides to use additional evidence, which evidence has been subject to discovery under this rule, that party shall promptly notify the court and the opposing party of the existence of the additional evidence." Rule 16.5 provides, in pertinent part:
 "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; may grant a continuance if requested by the aggrieved party; may prohibit the party from introducing evidence not disclosed; or may enter such order as the court deems just under the circumstances."
In Minnis v. State, 690 So.2d 521 (Ala.Crim.App. 1996), this Court found that certain evidence should have been, but was not, disclosed to defense counsel before trial; however, this Court stated:
 "The appellant did not seek a continuance or request a recess. As we noted in McLemore v. State, 562 So.2d 639, 645 (Ala.Cr.App. 1989):
 "`Under the circumstances presented here, . . . it appears "that either a recess or continuance would have been sufficient to protect [the appellant's] interests and permit him to review and evaluate this particular evidence in the same manner as had he received this information prior to trial. Having failed to make any showing to the contrary and having failed to request either a continuance or recess, [the appellant] cannot claim error on the part of the trial court in denying his request to exclude the evidence. United States v. Battle, [835 F.2d 646 (6th Cir.1987)]; United States v. Kubiak, [704 F.2d 1545 (11th Cir.), cert. denied 464 U.S. 852, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983)]."'"
690 So.2d at 527.
In Pettway v. State, 607 So.2d 325
(Ala.Crim.App. 1992), this Court stated:
 "This Court has repeatedly stated that it `views the failure to comply with [the discovery principles embodied in Rule 16, A.R.Crim.P. (formerly Rule 18, A.R.Crim.P.Temp.),] with particular disfavor and condemnation.' Morrison v. State, 601 So.2d 165, 173 (Ala.Cr.App. 1992); McLemore v. State, 562 So.2d 639, 645 (Ala.Cr.App. 1989); Buchannon v. State, 554 So.2d 477, 486
(Ala.Cr.App.), cert. denied, 554 So.2d 494 (Ala. 1989), overruled on other grounds, Pardue v. State, 571 So.2d 333 (Ala. 1990). We have also made it clear, however, that not every violation of Rule 16 requires the suppression of the undisclosed evidence. E.g., Buchannon, 554 So.2d at 486; Fortenberry v. State, 545 So.2d 129, 142
(Ala.Cr.App. 1988), affirmed, 545 So.2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); McCrory v. State, 505 So.2d 1272, 1279 (Ala.Cr.App. 1986). Instead, Rule 16.5 `gives a trial judge a *Page 1121 
number of options to consider in imposing sanctions on a party who has failed to comply with the court's discovery order.' Clifton v. State, 545 So.2d 173, 178 (Ala.Cr.App. 1988).
"Rule 16.5 provides in pertinent part:
 "`If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; may grant a continuance if requested by the aggrieved party; may prohibit the party from introducing evidence not disclosed; or may enter such order as the court deems just under the circumstances.'
 "Whether and to what extent a trial court imposes sanctions for non-compliance with Rule 16 rest "within the sound discretion of the court.' McCrory v. State, 505 So.2d at 1279."
607 So.2d at 330-31.[2]
 A.
Jennings specifically argues that the prosecutor violated discovery rules because he showed a photograph to witness Douglass before trial but did not disclose the photograph to the defense until trial. Jennings contends that his cousin, Isaiah Hall, Jr., had traveled with Gonzalez from the garage to the Riggs Road residence, that his cousin resembles him physically, and that Hall was the person that Douglass saw with Gonzalez.[3]
Jennings avers that his case is analogous to Jones v.State, 536 So.2d 102 (Ala.Crim.App. 1986), a case involving the nondisclosure of a mug shot and the argument that a misidentification had occurred because a family member who resembled the appellant had actually committed the crime. However, the facts in Jones are clearly distinguishable. In Jones, the defendant averred that his brother had committed the crime; that at the time of the offense he had a full beard, but his brother was clean shaven and shorter in height than Jones; and that a mug shot was taken at the time of his arrest. Testimony at trial indicated that the man who purchased the narcotics from the officers was shorter than the appellant and was clean shaven. This Court remanded the case for the trial court to conduct a hearing on the motion for a new trial, which had been denied by operation of law, stating that there was an inference that the State may have withheld potentially exculpatory evidence.
Initially, we question whether this issue was preserved for appellate review. When the prosecutor informed the trial court that she had just discovered the *Page 1122 
photograph in her files, Jennings objected on the grounds that that was the first he had heard of a pretrial identification and that the identification was tainted and Jennings's due-process rights had been violated. Although Jennings did state that that was the first time that he had been informed of the photograph, it appears that Jennings is advancing for the first time on appeal the contention that he was prejudiced by the timing of the disclosure of the photograph or the specific grounds that Hall, not he, was the person Douglass saw outside of the garage and, therefore, that Douglass's identification of him as the perpetrator was mistaken. Rather, the entire crux of Jennings's argument at trial, and thus the trial court's ruling on his objection and motion for a mistrial, involved whether the pretrial viewing was so unnecessarily or impermissibly suggestive as to affect the in-trial identification. "The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parte Frith,526 So.2d 880, 882 (Ala. 1987).
Moreover, even if this issue had been preserved, we note that here, unlike in Jones, there is no inference that the photograph was potentially exculpatory. Jennings has not presented any argument regarding distinguishing physical characteristics between himself or Hall that the photograph may reveal to indicate that Douglass's identification of him at trial was mistaken. Nor has he argued that the photograph was shown to Knox or to Gonzalez, who, according to testimony at trial by law-enforcement officers, identified Jennings to the police during their operation, which resulted in his arrest. Thus, nothing in Jones suggests that Jennings is entitled to any relief on this claim, and Jennings does not argue that he was prejudiced in any other way by the timing of the disclosure of the photograph. In short, there is nothing before this Court that indicates that Jennings was prejudiced by the disclosure of the photograph at trial rather than before trial. Thus, we cannot say that the trial court, which conducted an extremely thorough inquiry into the effects of the photograph on the in-court identification as discussed more fully in Part II of this opinion, erred in refusing to grant Jennings any relief based on the untimely disclosure of the photograph.
 B.
Jennings argues that the State failed to produce all of its agreements with Knox, and that some of the information produced was inaccurate. The crux of Jennings's argument is that he was informed before trial that the agreed-upon sentence recommendation for Knox was a 10-year reverse split sentence but that he learned at trial that the recommended sentence was a 15-year reverse split sentence and that Knox was not required to divulge the name of the family friend in Texas who supplied him the drugs. Although there was discussion regarding the extent to which Jennings could cross-examine Knox about the name of his contact in Texas, there does not appear to have been any objection at trial to the timing of the disclosure of the complained-of discrepancy in the sentence and possibility that pursuant to an agreement with the State Knox may not have been required to name his source. "In order for this court to review an alleged erroneous admission of evidence, a timely objection must be made to the introduction of the evidence, specific grounds for the objection should be stated and a ruling on the objection must be made by the trial court."Goodson v. State, 540 So.2d 789, 791 (Ala.Crim.App. 1988), abrogation on other grounds recognized by Craig v.State, 719 So.2d 274 *Page 1123 
(Ala.Crim.App. 1998). "When a timely objection at the time of the admission of the evidence is not made, the issue is not preserved for this Court's review." Ziglar v. State,629 So.2d 43, 47 (Ala.Crim.App. 1993). Thus, it does not appear that Jennings preserved this claim by timely objection.
Moreover, in his brief, Jennings makes the bare assertion that "[t]he complete terms of the agreement with Mr. Knox were suppressed by the State of Alabama and rendered a fair trial impossible." (Jennings's brief at p. 44.) Jennings does not, however, present any argument as to how he was prejudiced by the conflicting information that was disclosed at trial or why that information rendered a fair trial impossible, nor did he present any such argument in his motion for a new trial. Further, it is clear from the record that Jennings was aware that Knox was testifying pursuant to a negotiated agreement and that he would probably not serve time in prison. The discrepancy in the recommended sentence and the additional disclosure that he was not required to divulge the name of his source were thoroughly presented to the jury. There is nothing before this Court which gives rise to the inference that Jennings was denied a fair trial or that the outcome of the proceedings would have been any different had the additional and amended details of the State's agreement with Knox been disclosed earlier. See Taylor v.State, 666 So.2d 36 (Ala.Crim.App. 1994) (a requirement for a reversal on this issue is a showing of prejudice resulting from the allegedly belated actions by the State). Thus, Jennings is not entitled to any relief on this claim.
 C.
Jennings next argues that the prosecutor failed to timely disclose photographs of the latent fingerprints from the Ziploc brand plastic bags. Jennings references several motions he filed attempting to require the prosecution to provide the defense with access to or a copy of the photographs. Further, on the morning of trial, Jennings moved for a continuance on the ground that the fingerprint evidence had not yet been provided to his expert witness. The State argued that some of the evidence had been made available to the defense before trial and that the State had attempted to provide the materials even earlier but could not because of defense counsel's schedule. The trial court informed Jennings that the defense would not be required to begin its case-in-chief until that Wednesday morning, regardless of when the State concluded its presentation of the evidence, and, further, that defense counsel would be allowed during the State's case either (1) to take a break to consult with the defense expert before cross-examining the State's fingerprint experts; (2) to conduct a partial cross-examination of the State's fingerprint experts and then recall them later after discussing cross-examination strategy with the defense expert; or (3) to reserve his cross-examination of those witnesses altogether until he had had an opportunity to consult with the defense expert. The following day, during the testimony of one of the State's fingerprint witnesses, Jennings argued that he had not been provided a copy of fingerprint evidence, to which the prosecutor argued that the evidence was contained in material that defense had seen on the Friday before trial and, further, that the prosecutor had attempted to provide the material to defense counsel as early as two weeks before trial. The trial court made a copy of the evidence and provided it to defense counsel.
Jennings does not argue how he was prejudiced by the late disclosure of that evidence. See Taylor v. State, supra. *Page 1124 
Further, we note that the trial court informed the defense on the Monday morning on which the trial began that, because of the timing of the disclosure, the defense would not be required to begin its case until that Wednesday, regardless of when the State concluded its presentation of the evidence. The trial court further informed the defense that it could, with respect to cross-examining the State's fingerprint witnesses, either call the defense expert after the direct examination of each witness had concluded and then cross-examine the State's witnesses; it could conduct a limited cross-examination of the State's fingerprint experts and then recall those witnesses at a later point in the trial after counsel had had an opportunity to discuss the untimely disclosed fingerprint evidence with the defense expert; or it could declare those witnesses subject to recall and recall those witnesses for cross-examination at a later point in trial after counsel had had an opportunity to discuss the untimely-disclosed fingerprint evidence. Thus, the trial court fashioned a remedy for the defense curing any harm caused by the late disclosure, and Jennings has failed to argue how that remedy was insufficient.[4] See, generally,Minnis v. State, 690 So.2d 521 (Ala.Crim.App. 1996) (recess or continuance would have been sufficient to remedy untimely discovery and protect defendant's rights). See alsoPettway v. State, 607 So.2d 325 (Ala.Crim.App. 1992) (Rule 16.5 allows for a number of options by which a trial court may remedy discovery violations). Therefore, he is not entitled to any relief on this claim.
 D.
Jennings argues that the untimely disclosure of the Ziploc brand plastic bags prevented him from attacking the thoroughness of and good-faith basis for the investigation. He further notes that this inquiry was shown to be necessary in light of discrepancies in reports prepared by the two fingerprint experts for the State.
Before trial, Jennings argued that the Ziploc bags had not yet been provided to the defense. The prosecutor argued that the bags could not be located, but that photographs of the bags and latent finger-prints located on the bags had been made available to the defense the week before trial. The trial court instructed the prosecution to provide the defense expert with copies of the fingerprint evidence, and further stated that the defense would not be required to begin its case until Wednesday of that week and could delay its cross-examination of the State's fingerprint experts until after consulting with the defense expert.
We note that the Ziploc bags were eventually introduced during the trial. Jennings did not object to the untimely production, nor did he argue that he was prejudiced by the timing of the disclosure. Rather, the bags were introduced and admitted into evidence without objection. "In order for this court to review an alleged erroneous admission of evidence, a timely objection must be made to the introduction of the evidence, specific grounds for the objection should be stated and a ruling on the objection must be made by the trial court." Goodson v.State, 540 So.2d at 791, abrogation on other grounds recognized by Craig v. State, 719 So.2d 274
(Ala.Crim.App. 1998). "When a timely objection at the time of the admission of the evidence is not made, the issue is not preserved for this Court's review." Ziglar v. State,629 So.2d at 47. *Page 1125 
Moreover, with regard to Jennings's reliance on discrepancies in the two reports filed by the State's fingerprint experts,[5] we note that one expert submitted a second, corrected report, which more closely corresponded to the findings of the second expert. Further, Jennings's argument implicitly attacks the discrepancy as to one of the latent prints on one of the plastic bags, but does not attack the findings as to any of the other latent prints. The State further noted, on appeal and at trial, that the defense had been provided copies of the photographs of the latent prints discovered on the bags. Therefore, Jennings did have an opportunity for his expert to review the fingerprints. Based on our review of the record, we conclude that Jennings has failed to show that he is entitled to any relief on this ground.
 E.
Jennings argues that the recorded statements of Gonzalez and Knox, the two alleged accomplices who implicated Jennings, were untimely disclosed to him.
At trial, Jennings argued that the prosecutor had not provided him with a copy of the taped-recorded statements of Gonzalez and Knox and requested an opportunity to hear those recordings outside of the presence of the jury. After some discussion in which the prosecutor argued — and the trial court determined — that Jennings had known of the recordings before trial, the trial court instructed the prosecution to call another witness and not to play the tapes for the jury until Jennings had an opportunity to review the recordings that evening after court had adjourned for the day. Jennings has not presented this Court with any argument as to why this remedy by the trial court — which defense counsel requested — was insufficient, nor does our review of the record indicate that Jennings was deprived of his right to a fair trial, even if he only learned of the tapes at trial. See, generally,Minnis v. State, 690 So.2d 521 (Ala.Crim.App. 1996) (recess or continuance would have been sufficient to remedy untimely discovery and protect defendant's rights). See alsoPettway v. State, 607 So.2d 325 (Ala.Crim.App. 1992) (Rule 16.5 allows for a number of options by which a trial court may remedy discovery violations). Therefore, Jennings is not entitled to any relief on this claim.
 F.
Jennings next argues that the State failed to furnish complete and accurate reports of the fingerprint examinations and the certificate of analysis of the marijuana that Gonzalez sold to Douglass during the controlled drug buy monitored by authorities. Although Jennings argued at trial that Officer Guy's fingerprint report provided to him was different than the report introduced and testified to at trial, he does not argue how he was prejudiced by the untimely disclosure of that evidence. Similarly, with regard to the untimely disclosure of the certificate of analysis of the Gonzalez-buy marijuana, although Jennings filed a substantial number of motions and made numerous arguments regarding the lack of production of certain evidence, he has not advanced any argument as to how he was prejudiced by the timing of the production of this certificate of analysis, other than the bare allegation that timely disclosure of the certificate of analysis would have allowed him to attack the investigation. See Taylor v.State, supra (a requirement for a reversal on this issue is a *Page 1126 
showing of prejudice resulting from the allegedly belated actions by the State).
 G.
To summarize, with respect to each of the aforementioned evidentiary matters, Jennings appears to argue that he is entitled to a new trial as a matter of law simply because the State failed to timely produce certain evidence. However, Jennings has offered no explanation as to how he was prejudiced by the timing of the State's disclosure of that evidence. SeeTaylor v. State, supra (a requirement for a reversal on this issue is a showing of prejudice resulting from the allegedly belated actions by the State). There is no allegation in Jennings's brief on appeal, and no indication in the record, that Jennings was unable to effectively cross-examine the witnesses about the disclosed materials, that he was unable to fully present his defense, or that he was denied the opportunity to negotiate a plea with the State or that he declined any plea offer by the State based on his lack of knowledge about any of the evidence. All of the evidence was presented to the defense either at or before trial. The trial court crafted remedies for some of the untimely disclosures, and determined that no remedy was necessary for the other evidence. To the extent that Jennings's argument challenges the actual evidentiary rulings during the course of the trial, we conclude that those rulings did not constitute an abuse of that court's discretion.[6] For these reasons, Jennings is not entitled to any relief on this claim.
 II.
Jennings next contends that the trial court erred when it failed to suppress the in-court identification of him as unreliable and tainted by an impermissibly suggestive pretrial procedure and when it denied his motion for a mistrial based on that in-court identification.
Kelly Douglass testified that he had been arrested for selling illegal narcotics while he was a student at the University of Alabama. According to Douglass, he entered into an agreement with law enforcement to provide information and to act as an undercover operative in exchange for the dismissal of the charges against him. Douglass testified that he arranged to purchase a quantity of marijuana from Gonzalez, an individual with whom he had previously engaged in drugs deals. After testifying about the details of the planned drug purchase and an aborted first trip to the garage where Gonzalez worked, Douglass testified that he went back to meet Gonzalez again to purchase the marijuana. According to Douglass, he and three officers drove past the garage slowly after telephoning Gonzalez, and they observed two black men standing beside a white Chevrolet truck in the parking lot; Douglass identified Jennings as one of two men he saw standing next to the truck. Douglass further stated that he saw Jennings after he spoke with Gonzalez on the telephone to set up the drug purchase.
On cross-examination Douglass conceded that he had never spoken with Jennings and that he could not identify his voice.[7] In response to questioning by the *Page 1127 
defense, Douglass testified that he had not been familiar with Jennings before seeing him outside of the garage:
 "[Douglass]: No, sir, no, sir. I know he had little pigtails in his head — in his hair.
 "[Defense counsel]: What I'm trying to say is —
 "[Douglass]: Have I ever met him before?
 "[Defense counsel]: — did you know prior to the very first voice on this recording an individual by the name of Billy Jennings?
 "[Douglass]: No, sir.
 "[Defense counsel]: You had never seen him?
 "[Douglass]: Prior to —
 "[Defense counsel]: Prior to the very first voice.
 "[Douglass]: No, sir.
 "[Defense counsel]: Now, yet during your testimony you were very certain that it was Billy Jennings at the auto shop?
 "[Douglass]: Yes. I seen him as [Agent Robertson], myself, [and two other officers] drove by the shop.
 "[Defense counsel]: Now, how did you know that that person was Billy Jennings?
 "[Douglass]: I seen him from me to you.
 "[Defense counsel]: Now, what you are saying, you're looking at someone whom you never saw before. Yet you came right in here today and you said I saw Billy Jennings. Did anyone help you make that identification?
 "[Douglass]: What — Be more specific.
 "[Defense counsel]: You indicated to this Court and to this jury that you had never met Billy Jennings —
 "[Douglass]: That is correct.
 "[Defense counsel]: — before this case. But you drive by Los Garcias Garage and you see a man who you later come in and say that was Billy Jennings.
 "[Douglass]: I had seen him in a lineup. And I picked him out by the pigtails in his hair. He had pigtails that day. Or I don't know what you call them. Corn [rows], pigtails."
(R. 646-47.) Defense counsel then approached the bench and advised the court that the defense had not received any information about a pretrial identification or evidence of a photographic lineup; defense counsel further stated that he would like an opportunity to determine whether the pretrial identification was tainted. The trial court instructed the defense to continue its cross-examination of Douglass on another subject and indicated that the court would address the matter at a later point.
Later in the cross-examination, Douglass testified that he first saw Jennings standing outside of the garage talking to Gonzalez after Douglass had made the telephone call arranging the controlled purchase. Douglass stated that as he drove by the garage with the officers, Agent Robertson mentioned Jennings's name; according to Douglass, Agent Robertson knew who Jennings was, but Douglass specifically stated, "I did not. And I did not remember his name, but I remembered his face with the little pigtails in his hair." (R. 653.) Douglass stated that they were driving slowly past the garage and that he observed Jennings for 15-20 seconds.
The trial judge, former Alabama Supreme Court Associate Justice John H. England, Jr., conducted an extensive hearing *Page 1128 
outside of the presence of the jury to obtain all necessary information before ruling on Jennings's motion to suppress the in court identification. The hearing provides an almost textbook illustration of the proper inquiry necessary before ruling on a motion to suppress an in-court identification. During that hearing, the prosecutor stated that the Friday before the trial began, Douglass had been shown a single photograph of Jennings with no identifying information and had been asked whether he had seen that individual before. According to the prosecutor, Douglass stated that he recognized the man from seeing him at the garage on the day of the drug buy. Defense counsel moved for a mistrial, and the trial court denied that motion. The trial court then granted the defense's request to question Douglass to determine whether the identification was tainted by his viewing of the photograph. Still outside of the hearing of the jury, defense counsel questioned Douglass about the photograph. According to Douglass, the assistant district attorney was flipping through her files and pieces of paper with typewritten words on them; she asked if he would recognize the guy he had seen; one of the pages she flipped to had a photograph on it; and he looked at the photograph and identified the man in the photograph as the man he had seen at the garage. Douglass could not remember whether she asked if he could identify the man before she flipped to the page with the black-and-white photograph or while she was stopped at that page. According to Douglass, Jennings's appearance at trial differed from the photograph in that Jennings had "little pigtails" in his hair in the photograph but did not at trial. Douglass stated that Jennings's hair in the photograph was the same as when he saw him outside of the garage. Douglass stated that his memory was refreshed by seeing the photograph, specifically noting Jennings's eyes and hair. Douglass further stated that when the assistant district attorney flipped to the page with the picture of Jennings, Douglass said "That's him right there, isn't it, and [the assistant district attorney] said I can't tell you that." (R. 660.) Douglass testified that he did not recall any writing on the photograph, but he conceded that there could have been. Douglass further stated that the assistant district attorney was turning the pages in her file quickly when he saw the photograph. According to Douglass, it was more difficult to identify Jennings at trial because his hair was different than it was in the photograph or when he saw him outside of the garage. Douglass stated that he was approximately 30 feet from Jennings when he saw him outside of the garage, and that the photograph "possibly" refreshed his recollection. (R. 662.)
Defense counsel then argued that the in-court identification should be suppressed because the witness was shown a single-photo lineup and asked if he could identify the person and the in-court identification was made more easily as a result. The trial court noted that the question neither the State nor the defense had addressed was whether the extrajudicial identification was so impermissibly suggestive as to taint the in-court identification.
At that point, the trial court questioned Douglass as follows:
 "[The Court]: All right. The first question I want to ask you, sir, is whether or not your identification that you made here in court was based upon what you independently saw on the occasion in December of 2002 or whether or not it was based in part on what you saw from the picture that you looked at four or five days ago?
 "[Douglass]: December of 2002. *Page 1129 
 "[The Court]: All right. Now, in your response you said that you were able to identify him based on — you couldn't pronounce what it was, but piglets [sic] or something in his head.
 "[Douglass]: Yeah, pigtails or something in his hair.
 "[The Court]: You used that term.
 "[Douglass]: Yes, sir.
 "[The Court]: Now, you indicated that that was something that was contained in the picture.
 "[Douglass]: That's correct.
 "[The Court]: So that's why I asked. Did that picture suggest to you that the person in that picture was the same individual that you saw on December — in December of 2002?
 "[Douglass]: Yes, sir.
 "[The Court]: All right. So that picture did suggest to you that the person who you were shown by [the prosecutor] was the person that you saw back on December 2002?
 "[Douglass]: I don't understand your question exactly, Your Honor. You are saying if he wouldn't have had those I wouldn't have identified him? Is that what you're saying?
 "[The Court]: Did that aid you in identifying him? I'm not suggesting that you would not have. I want to know did it aid you —
 "[Douglass]: The pigtails?
 "[The Court]: The pigtails in the picture that you were shown last week. Did that aid you in identifying him in court here today? That's the question I'm asking you.
 "[Douglass]: Yes."
(R. 665-67.) The following exchange then occurred between the prosecutor and Douglass:
 "[Prosecutor]: Mr. Douglass, you indicated that the defendant here today has distinguishing characteristics in his eyes; is that correct?
 "[Douglass]: That is correct.
 "[Prosecutor]: Do you recognize his eyes as you see them today from the photograph that you saw last week or do you recognize them from when you saw him in December of 2002?
 "[Douglass]: December. I mean, when — as soon as I seen the picture, I knew that was him. I'm like — [the assistant district attorney] was flipping through documents, I mean, and I said, `That's him right there.' I mean —
 "[Prosecutor]: And it was suggested to you that the photograph being shown to you was the photograph of the individual we are here in court on today?
 "[Douglass]: No, ma'am.
 "[Prosecutor]: And in fact did you not ask `[I]s that Billy Jennings?'
 "[Douglass]: Yes, ma'am.
 "[Prosecutor]: And what was the response?
 "[Douglass]: You would not tell me. `I can't tell you that.'
 "[Prosecutor]: What do you mean when you said earlier in your testimony that it was more difficult to identify him today because of the pigtails depicted in the photograph you saw last week?
 "[Douglass]: Because he doesn't have them now, so I had to look at his eyes.
 "[Prosecutor]: And did the — and I understand from your earlier testimony that the characteristics that you recognize in his eyes are characteristics that you recognize from December 2002 and not from the photograph; is that correct?
 "[Douglass]: That is correct.
 "[Prosecutor]: Mr. Douglass, do you know whether or not you would have been able to identify Mr. Jennings in *Page 1130 
court today without respect to the photograph that you saw last week?
 "[Douglass]: Yes, ma'am.
 "[Prosecutor]: And —
 "[Douglass]: The answer is yes, ma'am.
 "[Prosecutor]: You would have been able to identify him even if you had not seen the photograph last week?
 "[Douglass]: Yes, ma'am."
(R. 667-69.) Jennings again moved for a mistrial, which the trial court again denied. The trial court asked whether Jennings was requesting any other relief. Jennings requested a cautionary instruction be given to the jury about the suggestive nature of the recent photographic display to the witness, and the trial court stated it would consider the request, and that it would also determine whether to instruct the jury to disregard the in-court identification. Douglass stated, still outside of the presence of the jury and in response to further-questioning by the prosecutor, that he did not observe the words "Tuscaloosa Police Department" above the photograph or the words "Jennings, Billy Perez" below the photograph. (R. 671.)[8] The trial court recessed for the day.
The following morning, the trial court and both parties again questioned Douglass outside of the presence of the jury about his opportunity to view Jennings outside of the garage and the effects, if any, his viewing of the photograph the week before trial had on his in-court identification of Jennings. Douglass stated that he referenced the "pigtails" for the first time in court and had not discussed that term with anyone prior to testifying; that he had observed Jennings for 10-20 seconds outside of the garage; that he distinctly remembered Jennings's eyes; that he was within five feet of Jennings at one point; and that he could have made the identification in court without viewing the picture the week before trial. Douglass further stated that he recalled one of the officers in the vehicle with him identifying Jennings by name as they drove past; that nobody instructed him to look at Jennings; that the comment by the officer did not draw his attention to Jennings; that he observed Jennings on his own as Jennings was talking to Gonzalez; that he did not know at the time that Jennings was a suspect; and that as far as he was concerned Gonzalez was the focus of the operation. According to Douglass, his in-court identification was based on his independent recollection rather than the photograph. Douglass further testified about specific details he had observed about Jennings, the second, unidentified man, and Gonzalez while driving past the garage.
Douglass was excused from the stand. In response to an inquiry by the trial court, the prosecutor stated that she had spoken with Agent Robertson and that he had advised her that he would not have been the one to identify Jennings when they drove past the garage because he was not familiar with Jennings at that time. The prosecutor further stated that she had spoken with one of the other two officers and that that officer informed her that she had not identified Jennings either. However, the prosecutor conceded that she had not spoken with the third officer and could not speculate whether that officer had identified Jennings by name as they drove past the garage. After hearing extensive arguments from the parties (R. 691-99), the trial court denied the motion for a mistrial and the motion to suppress the in-court *Page 1131 
identification, stating that it found the question of whether the pretrial viewing of the photograph was unnecessarily or impermissibly suggestive to be a close one, and that the reliability of the in-court identification had not been affected.[9]
"In Blackmon v. State, 487 So.2d 1022
(Ala.Crim.App. 1986), this Court stated:
 "`"`[T]he required inquiry is two-pronged. The first question is whether the initial identification procedure was "unnecessarily" [Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)] or "impermissibly" [Simmons v. U.S., 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247
(1968)] suggestive. If it is found to have been so, the court must then proceed to the question whether the procedure found to . . . have been "unnecessarily," or "impermissibly" suggestive was so "conducive to irreparable mistaken identification" [Stovall] or had such a tendency "to give rise to a very substantial likelihood of irreparable misidentification" [Simmons] that allowing the witness to make an in-court identification would be a denial of due process. United States ex rel Phipps v. Follette, 428 F.2d 912, 914-915 (2d Cir.1970).'"'
"487 So.2 at 1025.
"In Ex parte Johnson, 620 So.2d 709 (Ala.), on remand,620 So.2d 714 (Ala.Crim.App.), cert. denied,510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993), the Alabama Supreme Court stated:
 "`Pretrial identifications are to be set aside on grounds of prejudice only if the pretrial identification procedure is so suggestive as to give rise to a substantial likelihood of misidentification. Ex parte Stout, 547 So.2d 901 (Ala. 1989). The totality of the circumstances surrounding the out-of-court identification need be analyzed only when the pretrial procedures used appear to have been unnecessarily or impermissibly suggestive. Stout.'
 "620 So.2d at 712."
Hunter v. State, 802 So.2d 265, 271 (Ala.Crim.App. 2000).
The trial court articulated for the record its reasons for denying the motion for a mistrial and the motion to suppress the in-court identification. The trial court stated that it viewed the question of whether the pretrial photographic display was unduly or impermissibly suggestive as "a very, very close question." (R. 699.) The trial court noted that it could be inferred from the testimony at the hearing that the prosecutor did not suggest that the photograph Douglass was shown was of the man suspected in the offense, and that it was a mere coincidence that Douglass observed the photograph at the time, or shortly after, the prosecutor had asked whether Douglass would be able to identify the man at the truck if he saw him again and that Douglass, when he saw the photograph, pointed and stated that that was the man. The trial court further noted that the evidence could also support the inference that the prosecutor showed Douglass the photograph and asked him, in an attempt to get an identification of Jennings, whether he could identify Jennings. Although the trial court later stated that it did not find the pretrial viewing of the photograph to be unnecessarily or impermissibly suggestive, the trial court, because it viewed this first inquiry to be close, proceeded to the second prong of the inquiry. *Page 1132 
To determine the reliability of the identification, we look to the five-part test established in Neil v. Biggers,409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The five factors to be considered in assessing the reliability of the in-court identification are: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Neil v.Biggers, 409 U.S. at 199-200, 93 S.Ct. 375.
The trial court addressed and weighed each of the five factors, assessing the reliability of the identification as follows: (1) that the witness had had an adequate opportunity to view the defendant, specifically noting that the viewing at the scene was comparable to or longer than in those previous cases; (2) that the witness's attention had been focused on Gonzalez, the person to whom Jennings was supposedly standing beside and speaking to at the time of he observed Jennings; (3) that there had not been a prior description with which to compare the current description; (4) that while the witness had stated that the pretrial viewing helped him, the witness had clearly indicated that the pretrial identification while meeting with the prosecutor and the in-court identification were both based on his observances of Jennings at the scene in December; and (5) that approximately 20 months had passed between the December 2002 viewing at the scene and the September 2004 pretrial viewing of the photograph. Thus", the trial court concluded, factor (1) weighed slightly in the State's favor; factors (2) and (4) clearly weighed in the State's favor; factor (3) was not really applicable to this case; and factor (5) weighed in favor of the defense. The court concluded, "a substantial risk of misidentification was not created by the identification procedure which took place in the questioning by the district attorney's office of this witness on last week." (E, 706.) Only after giving this well-reasoned and detailed explanation did the trial court deny Jennings's motion to suppress the in-court identification and his motion for a mistrial.
"When an in-court identification of the accused is shown to have a basis independent of any pre-trial identification, then it is correctly received into evidence." Ex parteStout, 547 So.2d 901, 904 (Ala. 1989). As is evident from the lengthy discussion above, Judge England conducted an extensive hearing outside of the presence of the jury to obtain all applicable information before he ruled on Jennings's motion to suppress the in-court identification. The hearing thoroughly encompassed whether the identification procedure was unnecessarily or impermissibly suggestive and, further, whether there was a substantial likelihood of misidentification. Further, Judge England thoroughly inquired into facts so as to address each of the five factors discussed in Neil v.Biggers, supra. This hearing provides an almost textbook illustration of the proper inquiry before ruling on a motion to suppress an in-court identification, and, after reviewing theextensive testimony and arguments in the record, as well as the trial court's thorough and well-stated explanation for its denial of the motion to suppress and the motion for a mistrial, we cannot say that the trial court abused its discretion in denying those motions. Therefore, Jennings is not entitled to any relief on this claim.
 III.
Jennings next argues that his separate convictions for two counts of trafficking in marijuana violate double-jeopardy *Page 1133 
principles because, he claims, the marijuana should have been considered in the aggregate as one possession rather than separated into the two possessions that gave rise to the multiple charges and convictions.
After the trial court had denied Jennings's motion for a judgment of acquittal at the close of the State's evidence, the following exchange occurred:
 "THE COURT: All right. The Court is still of the opinion that the motion is due to be denied.
 "However I still have a question related to the State's position regarding the marijuana which is the subject of the Gonzalez sale being a part of the marijuana that was in Christopher Knox's residence, that being removed from Christopher Knox's residence that that coming from that — I wanted to know the State's position regarding that at some point, but at least — But it's before the court now and the motion is denied.
 "[Prosecutor]: Do you want me to go into that?
 "THE COURT: No. But before this case goes to the jury, I want to have the State's position regarding that.
 "[Prosecutor]: Okay.
 "THE COURT: And whatever the defendant has on that point too."
(R. 973-74.)[10] As Jennings acknowledges in his brief, the question was not taken up again until sentencing, at which time Jennings requested that the trial court consider grouping the amounts as one possession.
In Straughn v. State, 876 So.2d 492
(Ala.Crim.App. 2003), this Court determined that the question whether separate convictions for marijuana found at two different locations violated double-jeopardy principles was constitutional in nature, rather than jurisdictional. Thus, this Court determined that that question must be preserved for appellate review or it is waived. Here, as in Straughn, Jennings did not present a timely argument to the trial court. Therefore, this issue was not preserved for appellate review by a timely objection at trial.
 IV.
Jennings next argues that the trial court erred in denying his motions for continuances following what he contends was the untimely disclosure of discoverable information.
Initially, we note that, as has been discussed in Parts I and II of this opinion and is to be discussed more fully in Part IV, the trial judge dedicated a substantial amount of time to ensure that Jennings's rights were protected, conducting timely and extensive hearings outside of the presence of the jury to obtain all necessary information on each alleged discovery violation before he ruled on Jennings's motions.
 A.
In his brief, Jennings refers to a pleading styled as his "second motion to compel discovery and to impose sanctions for noncompliance" in which he argued that the prosecutor had still not produced, among other items, three negative strips of fingerprints. (C. 198-203.) Jennings further cites an exchange that occurred before jury selection in which the defense argued the grounds of that pleading and requested that the prosecution be prohibited from introducing evidence and eliciting *Page 1134 
testimony regarding the fingerprint evidence until the defense had had an opportunity to secure a fingerprint expert to assist the defense.
Jennings further referenced an exchange that occurred before the State called its first witness at trial. Out of the hearing of the jury, defense counsel requested that the trial court order the State to delay calling its witnesses who would testify as to the fingerprint evidence discovered on items until the defense expert had had an opportunity to examine the evidence and assist defense counsel in his cross-examination of the State's witnesses about the fingerprint evidence. Defense counsel further averred that he learned the Friday before trial that there were no photographs of the fingerprint negative strips. The prosecutor argued that defense counsel had never requested the photographs of latent prints and, further, that defense counsel had viewed the negative strips on the Friday before trial; the prosecutor further argued that the negative strips were made available on September 8, 12 days before trial. The prosecutor argued that its witness was coming from out-of-town to testify and that the order of the prosecution's witnesses should not be disrupted because the evidence had been made available two weeks before trial and defense counsel had waited until the morning of trial to argue that he could not adequately cross-examine the State's witnesses without first discussing the evidence with his expert.
The trial court stated that it would not require the prosecution to rearrange the order in which it intended to call its witnesses but instructed the prosecutor to inform her witnesses that they were subject to recall by the defense. However, the trial court further stated:
 "All right. Well, I thought I had addressed this issue earlier this morning when I said that I would permit the State to — the defendant not to have to put on its case until his expert had had an opportunity to review the material assuming the time constraints that were presented. That hasn't changed.
 "So I also indicated that I would give you an opportunity to call your — at least attempt to call your expert before you tried to cross-examine. I'm hoping, [defense counsel], that in the year and a half this case has been pending that some study about fingerprint has been done by both sides. If that hasn't been done, that's not something I can take care of. I can't provide knowledge about up-to-date techniques, about expert fingerprint so I'm going to go by what I said I was going to do this morning. If you wish to reserve you have two things that you can do as I said this morning. You can after cross-examination — I mean, after direct you can attempt to call your person and you can reserve the right to recall them and not ask him any questions. I'll go that far. You can do that, but that's about as far as I think I can go to direct how the State puts on their case.
 "I'll say one more thing and that is your information is that he was having a tooth removed at one o'clock. You don't know what his situation is at this point. I wish you could get somebody in your office to see if they can get in touch with him. If you are going to attempt to call him after the State finishes its direct and before you cross-examine, I think that you should at least know — Now, I know you haven't called him today. So I want you to do that, because when they finish I'm going to turn to you and expect you to either say I'm going to call him or I'm ready to cross-examine or I'm going to do some of my cross-examination and I want to reserve the right to *Page 1135 
recall this witness. So you have to do one of those three things."
(R. 184-85.) Jennings did not object to the trial court's ruling.
In his brief, Jennings cites Rule 16.5, Ala.R.Crim.P., for the proposition that "`[i]f at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may . . . grant a continuance if requested by the aggrieved party'" (Jennings's brief at p. 68.)[11] We note, however, that Rule 16.5 does not require the trial court to grant a continuance. Rather, Rule 16.5 provides that the circuit court may grant a continuance if requested. Further, Rule 16.5 provides the trial court with a number of other options to remedy a situation where a party has failed to comply with a discovery order. Rule 16.5 reads, in its entirety:
 "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; may grant a continuance if requested by the aggrieved party; may prohibit the party from introducing evidence not disclosed; or may enter such other order as the court deems just under the circumstances. The court may specify the time, place, and manner of making the discovery and inspection and may prescribe such terms and conditions as are just."
Although Jennings is correct that the trial court denied his request to continue the trial or to require the State to postpone calling its fingerprint experts, we note that the trial court ascertained that defense counsel had spoken with the expert generally about fingerprint evidence. Defense counsel further indicated that the expert was coming into town late in the afternoon on September 21 and could conduct his testing that evening and be prepared for trial on the morning of Wednesday, September 22. In response to defense counsel's arguments, the trial court declined to delay the beginning of the trial, but it did advise the parties that regardless of when the State rested, the defense would not begin presenting its case until the morning of Wednesday, September 22. The trial court further noted that it would allow defense counsel either (1) to take a brief recess at the conclusion of the State's direct examination of the witnesses about fingerprint evidence so that defense counsel could contact the defense expert to discuss how best to cross-examine those witnesses in light of their testimony on direct examination; (2) to conduct a limited cross-examination of those witnesses and then recall to them to examine them about the fingerprint evidence after consulting with the defense expert; or (3) to reserve his cross-examination of those witnesses altogether until after he had had an opportunity to consult with the defense expert.
Jennings's bare assertion in his brief that "the trial court did not grant the relief which Mr. Jennings requested and, in doing so, abused its discretion" (Jennings's brief at p. 71) does not persuade this Court that in fashioning its remedy, the trial court abused its discretion. See, generally, Minnis v.State, 690 So.2d 521 (Ala.Crim.App. 1996) (recess or continuance would have been sufficient to remedy untimely discovery and protect defendant's rights). See also Pettwayv. State, 607 So.2d 325 (Ala.Crim.App. 1992) (Rule 16.5 *Page 1136 
allows for a number of options by which a trial court may remedy discovery violations).
 B.
Jennings further states:
 "On September 21, 2004, on a different matter, Mr. Jennings addressed the Trial Court saying:
 "`Your Honor, at the very minimum we would request a continuance so that we could examine this new material that was presented so that we would have an opportunity to readjust, if necessary, the defense strategy in this case.
 "`Your Honor, I don't understand why this information is all of a sudden coming up in the midst of trial. It's prejudicial to Mr. Jennings. It has harmed our efforts over the past fourteen months to prepare a defense. This is trial by ambush. Your Honor, it is fundamentally unfair. It is a violation, I believe, of the rules of discovery and it is extremely prejudicial.' (R. 286.)
 "The trial court did not grant the relief which Mr. Jennings requested and, in doing so, abused its discretion."
(Jennings's brief at p. 71.)
Rule 28(a)(10), Ala.R.App.P., requires that an argument contain "the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Further, "[a]uthority supporting only `general propositions of law does not constitute a sufficient argument for reversal." Beachcroft Props., LLP v. City ofAlabaster, 901 So.2d 703, 708 (Ala. 2004), quotingGeisenhoff v. Geisenhoff, 693 So.2d 489, 491
(Ala.Civ.App. 1997). See also Connerly v. Connerly,523 So.2d 461 (Ala.Civ.App. 1988) (appellant's citations to general propositions of law that were not specifically applicable to the issues presented by the appeal do not fulfill the requirements of Rule 28, Ala.R.App.P.).
Here, with regard to this instance of alleged error by the trial court, the argument section of Jennings's brief contains only a quotation that does not indicate what information was alleged to have been untimely disclosed. That quotation, coupled with Jennings's citation to Rule 16.5, Ala.R.Crim.P., and his conclusion that the trial court's denial of his request for a continuance amounted to an abuse of the trial court's discretion, constitutes Jennings's entire argument as to this alleged instance of error. He has made no argument on appeal as to why the timing of the disclosure of that evidence was prejudicial, nor has he made any argument as to why the trial court's ruling was an abuse of that court's discretion. "It is not the job of the appellate courts to do a party's legal research. . . . Nor is it the function of the appellate courts to `make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.'" Pileri Ind., Inc. v. ConsolidatedInd., Inc., 740 So.2d 1108, 1110 (Ala.Civ.App. 1999), quoting Dykes v. Lane Trucking, Inc., 652 So.2d 248,251 (Ala. 1994). Because Jennings has failed to present sufficient argument, authority, or citation to the facts in support of this issue, we conclude that he has failed to comply with Rule 28(a)(10), and that this issue is, therefore, deemed to be waived. See, e.g., Giles v. State, 906 So.2d 963
(Ala.Crim.App. 2004), and Mumpfield v. State,872 So.2d 205 (Ala.Crim.App. 2003).
Moreover, we note that this request for a disclosure came during arguments challenging the timing of the prosecutor's disclosure *Page 1137 
of a supplemental statement of Christopher Knox, an alleged accomplice of Jennings's.[12] Although the trial court did not grant a continuance, it did instruct the prosecutor to instruct the witness not to refer to the statements until the trial court decided whether the statements were admissible. When Knox was called later during the State's case-in-chief, defense counsel approached the bench and noted that the prosecutor's line of questioning appeared to be directed toward the statements contained in the supplemental disclosure, to which the prosecutor responded, "I've already told him not to say it. I won't ask and he will not testify to that. That's what the Court has instructed me to do." (R. 450.) Then, during a break in Knox's testimony, the prosecutor asserted that, although the trial court had excluded the information in the supplemental disclosure, Jennings had opened the door for the State to question Knox about a specific comment he made in one of the supplemental disclosures indicating that Jennings had telephoned him and instructed him to bring some marijuana over; the trial court granted the State's request over an objection by the defense. At no point during this exchange did Jennings argue discovery-violation grounds as a basis for prohibiting the prosecutor from questioning the witness in response to the defense's line of questioning; rather, defense counsel merely argued that the State's intended line of questioning did not correspond with the statements. Thus, even if Jennings's brief were sufficient as to this instance, he would not be entitled to any relief on this claim because the trial court instructed the prosecution to not introduce the evidence, but then Jennings opened the door through his cross-examination of Knox, and, further, because he did not argue that the trial court's remedy was insufficient to cure any prejudice he might have endured as a result of the untimely disclosure.
 V.
Jennings argues that the trial court improperly limited his cross-examination of several witnesses.
In Reeves v. State, 807 So.2d 18 (Ala.Crim.App. 2000), this Court stated:
 "It is well settled that `[a] party is entitled to a thorough and sifting cross-examination of the witnesses against him,' McMillian v. State, 594 So.2d 1253, 1261 (Ala.Crim.App. 1991), remanded on other grounds, 594 So.2d 1288 (Ala. 1992), opinion after remand, 616 So.2d 933 (Ala.Crim.App. 1993), citing Perry v. Brakefield, 534 So.2d 602
(Ala. 1988), and § 12-21-137, Ala. Code 1975, and that a party should be given `wide latitude on cross-examination to test a witness's partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness's testimony or recollection as well as the extent of his knowledge.' Williams v. State, 710 So.2d 1276, 1327 (Ala.Crim.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). It is equally well established, however, `that the latitude and extent of cross-examination are matters which of necessity rest largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme cases of abuse.' Long v. State, 621 So.2d 383, *Page 1138 
388 (Ala.Crim.App. 1993), cert. denied, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993), quoting Beavers v. State, 565 So.2d 688, 689
(Ala.Crim.App. 1990). `The trial judge may reasonably limit the range of cross-examination on matters that are repetitious, argumentative, collateral, irrelevant, harassing, annoying, or humiliating.' Newsome v. State, 570 So.2d 703, 714
(Ala.Crim.App. 1989). `On appeal, the party claiming an abuse of such discretion bears the burden of persuasion.' Ross v. State, 555 So.2d 1179, 1180 (Ala.Crim.App. 1989), quoting Hembree v. City of Birmingham, 381 So.2d 664, 666
(Ala.Crim.App. 1980)."
807 So.2d at 38.
 A.
Jennings cites to two instances where he contends that the trial court improperly prevented him from questioning the State's fingerprint experts about misidentifications of fingerprint evidence that occurred in a case involving an individual in the State of Washington. According to Jennings, he was attempting to "test the knowledge and truthfulness" of the State's experts by cross-examining them about "the misidentification of . . . fingerprints [of an individual in an unrelated case] by several of the most experienced examiners in the law enforcement community" and that "[e]ach effort to address the possibility of error was met with an objection from the prosecutor." (Jennings's brief at p. 75.)
The first objection referenced in Jennings's brief occurred during the voir dire of Tim Guy of the Tuscaloosa Police Department. In a series of questions regarding Officer Guy's training, previous experience, and his use of suggested reference materials, the following exchange occurred:
 "[Defense counsel]: Did [published fingerprint experts] write about Brandon Mayfield?
 "[Officer Guy]: I'm not familiar with him. Whoever Brandon Mayfield is.
 "[Defense counsel]: You're not familiar with a FBI misidentification?
 "[Officer Guy]: The Madrid case?
 "[Defense counsel]: Yes.
 "[Prosecutor]: Your Honor, I object again based on"
 "THE COURT: Sustained. Objection sustained. Let's move on."
(R. 211-12.) At that time, defense counsel argued that the witness did not have sufficient experience to be qualified as an expert in the comparison of latent fingerprints.
The second instance occurred during cross-examination of Officer Guy:
 "[Defense counsel]: Now, you recall on voir dire I questioned you about the situation in Spain, the bombing in Spain. And you indicated to this Court that as an expert in this field you knew something about that misidentification.
 "[Prosecutor]: Objection. Relevance.
 "THE COURT: I sustain the objection. I'm not going to sustain it anymore. I'm going to instruct you not to go into that. It's irrelevant, [defense counsel]. Let's move on."
(R. 320.)
Initially, we note that Jennings did not make an offer of proof at trial as to what he expected the line of questioning to reveal. Additionally, Jennings did not argue that the errors allegedly committed by experts other than those involved in his case were relevant to his case. See Jennings v. State,513 So.2d 91 (Ala.Crim.App. 1987) (trial court will not be found in error where no proffer was made as to the expected testimony and a showing that the testimony was material). Further, we *Page 1139 
note that the defense was not prevented from thoroughly questioning both of the State's expert witnesses about their knowledge, experience, and training. Finally, we note that the defense was allowed to question the witnesses about discrepancies in their findings in this case. Thus, the trial court did not prevent Jennings from challenging the experts' qualifications or attacking the reliability of their findings in this case. Therefore, Jennings is not entitled to any relief on this claim.
 B.
Jennings also contends that the trial court improperly prevented him from questioning Knox about details of his plea agreement with the State. Specifically, Jennings argues that he should have been allowed to question Knox about the prosecutor's offer to waive the mandatory minimum sentence in exchange for Knox's testimony against Jennings.
Initially, we question whether this claim was preserved for appellate review or whether it has been sufficiently argued in brief. The particular exchange Jennings cites in his brief (R. 536-39) does not involve discussions about the prosecutor's offer to waive the minimum sentence. Rather, during that exchange, Knox's attorney testified that his understanding of the plea agreement was that Knox was to receive a 15-year sentence, reverse split so that he would serve 5 years on probation followed by 3 years in prison. Defense counsel then asked whether the witness was familiar with the range of punishment for trafficking in marijuana, at which time the prosecution objected. After a brief exchange, the trial court held a conference outside of the hearing of the jury. It is apparent from reading the ensuing colloquy that the trial court was not limiting the defense from questions related to Knox's plea agreement but intended to prevent Jennings from eliciting testimony designed to inform the jury of the range of punishment Jennings himself faced for the trafficking charges. See Ex parte Frith, 526 So.2d 880, 882 (Ala. 1987) ("The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial."). Further, the trial court informed defense counsel that if he thought about it further and believed he had a basis for going into the matter again, he should bring it to the court's attention — Jennings did not raise the issue again at trial. See generallyBush v. Alabama Farm Bureau Mut. Cas. Ins. Co., 576 Sd.2d 175 (Ala. 1991) (discussion as to the general rule of preservation regarding motions in limine).
Moreover, we note that Knox testified that the trafficking charge was still pending against him and that his understanding of the plea agreement was that he would be sentenced to 15 years, but that he would serve probation first and, if he did not get into trouble while serving the probationary period, that he might not have to serve any of the 3-year incarceration portion of the sentence. Defense counsel questioned Knox about whether his wife had been charged for the marijuana found at Knox's residence and the role that possibility played in his decision to plead guilty. Knox also testified, in response to defense counsel's questioning, that his understanding of the plea agreement was that he would not have to provide authorities with the name or contact information of the individual in Texas from whom he had obtained the marijuana that was discovered in Knox's house. Knox further testified that he believed there to be a five-year minimum sentence for a trafficking conviction. Knox also testified that there was discussion during the plea negotiations of a 15-year sentence, split so that he would serve one year, but that that was *Page 1140 
never finalized. Finally, Knox testified that he hoped that he would serve no jail time for his trafficking conviction because that was his understanding of the agreement.
In Smith v. State, 838 So.2d 413 (Ala.Crim.App. 2002), this Court stated:
 "`[I]t is well settled that "a defendant has a right to cross-examine an accomplice as to the nature of any agreement he has with the government or any expectation or hope that he may have that he will be treated leniently in exchange for his cooperation. Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1109-10, 39 L.Ed.2d 347 (1974)." United States v. Barrett, 766 F.2d 609, 614
(1st Cir.) (emphasis added [in Starks]) cert. denied, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264
(1985). If the accomplice has entered into a plea bargain agreement with the State, "the full terms of this agreement must be allowed to be placed before the jury." Dawkins v. State, 494 So.2d 940, 943 (Ala.Cr.App. 1986) (emphasis added [in Starks]). The accomplice's agreement with the State has bearing on his credibility and bias. Id. Additionally, the terms of the agreement provide the jury with an "understanding] of the possible motivations of the accomplice as he sits on the stand." State v. Donelson, 302 N.W.2d 125, 131 (Iowa 1981), quoted with approval in Dawkins v. State, 494 So.2d at 943. Moreover, where, as in this case, the accomplice is a key witness, the trial court has little, if any, discretion to curtail an accused's attempts to show bias or motive on the part of the witness. See Jones v. State, 531 So.2d 1251, 1254
(Ala.Cr.App. 1988); Proctor v. State, 331 So.2d 828, 830 (Ala.Cr.App. 1976).'
 "Starks v. State, 594 So.2d 187, 197
(Ala.Cr.App. 1991).
 "However, in the present case, the terms of Willis's plea agreement were before the jury. Defense counsel was allowed to cross-examine the witness extensively about the agreement and made the jury `fully aware of the possible influences that the plea agreement could have had on [Willis's] testimony. The jury was free to reject [Willis's] testimony. It chose not to do so.' Wilson v. State, 690 So.2d 449, 462
(Ala.Crim.App. 1995). See also Allen v. State, 611 So.2d 1152 (Ala.Crim.App. 1992)."
838 So.2d at 460.
Here, as in Smith, details of Knox's plea agreement were before the jury. Although Jennings was not allowed to question Knox or his attorney about whether there was a mandatory minimum incarceration period of three years for a trafficking conviction, the jury was clearly made aware that Knox had reached an agreement with the State and that he may not serve any time in prison pending his good behavior on probation. Further, Knox stated that his wife had not been charged for the marijuana, and that part of the agreement was that he did not have to divulge the name or contact information of the person who had supplied him with the marijuana. Thus, the jury was aware of the terms of Knox's plea agreement and the influences that that agreement might have had on his testimony. Therefore, Jennings is not entitled to any relief on this issue.
 VI.
Jennings next argues that the trial court erroneously denied his motion for a judgment of acquittal with regard to count II of the indictment. Specifically, he contends that the State failed to present sufficient circumstantial evidence from *Page 1141 
which the jury could infer that Jennings was involved in the sale of marijuana between Gonzalez and Douglass.
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v.State, 720 So.2d 1033, 1034 (Ala.Crim.App. 1998), quotingFaircloth v. State, 471 So.2d 485, 488
(Ala.Crim.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498
(Ala.Crim.App. 1997), quoting O'Neal v. State,602 So.2d 462, 464 (Ala.Crim.App. 1992)." "When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State,728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v. State,557 So.2d 848, 850 (Ala.Crim.App. 1990). "The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury."Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978) (emphasis added).
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir.1974); United States v. McGlamory, 441 F.2d 130 (5th Cir.1971); Clark v. United States, 293 F.2d 445 (5th Cir.1961)."
Cumbo v. State, 368 So.2d 871, 874 (Ala.Crim.App. 1978).
The State presented evidence that, if believed by the jury, connected Jennings to the marijuana that formed the basis for the trafficking charge in count II of the indictment. Douglass testified that he arranged to purchase five pounds of marijuana from Gonzalez and that Gonzalez told him to come back in about 20 minutes because he had to retrieve the marijuana from a nearby location. Officer Brian Oswalt testified that he provided surveillance from a helicopter; that he observed a white truck pull into the parking lot of the garage; that he observed the white truck leave the parking lot followed by a second truck that had already been at the garage; that he followed those trucks to a residence where he observed two individuals get out of the trucks and go into the residence for a few minutes; and that one of the individuals came out of the house and got back in the second truck and returned to the garage. The State's evidence further indicated that Douglass met Gonzalez and made the purchase and that he turned over what was later determined to be approximately four-and-one-half pounds of marijuana. Additional testimony indicated that Gonzalez admitted to the police that he was the driver of the second truck and that Jennings was driving the white truck. Further, Douglass identified Jennings as one of the men standing beside a white truck talking to Gonzalez in the parking lot at the garage. Knox identified Jennings as his next-door neighbor and partner in the purchase of a large *Page 1142 
amount of marijuana for resale; according to Knox, Jennings took a portion of the marijuana with him. Thus, the jury could have inferred that Gonzalez contacted Jennings after Douglass requested the marijuana; that Jennings drove to the garage and met with Gonzalez; that Jennings led Gonzalez to where he had stored the marijuana; and that Jennings provided the marijuana that was sold to Douglass. Therefore, the trial court correctly submitted the case to the jury.
 VII.
Finally, Jennings contends that the trial court erred in denying his motion for a new trial. Specifically, Jennings argues:
 "The written Motion for a New Trial and for Other Relief was predicated on the fact that he did not receive a fair and impartial trial. The manifest errors and irregularities in preliminary proceedings and in the trial are well documented. The errors and irregularities affected the substantial rights of Mr. Jennings and included denials of a continuance as well as discovery, due process, and double jeopardy violations.
 "The grounds urged by Mr. Jennings were preserved at trial by timely and adequate objections. Smith v. State, 393 So.2d 529, 532 (Ala.Cr.App. 1981); Fuller v. State, 365 So.2d 1010
(Ala.Cr.App. 1978), cert. denied, 365 So.2d 1013 (Ala. 1979). Further, many errors were fundamental and served to invalidate the trial in and of themselves. Fuller v. State, 365 So.2d at 1012 (quoting 24 C.J.S. Criminal Law § 1428 (1961))."
(Jennings's brief at p. 78.)
To the extent that Jennings's argument is based on issues previously addressed in this opinion, Jennings is not entitled to any relief on this grounds based upon our holdings in earlier parts of this opinion.
To the extent that Jennings intended to argue different grounds than those addressed earlier in this opinion, Jennings's argument on appeal does not sufficiently comply with Rule 28(a)(10), Ala.R.App.P., which requires that an argument contain "the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Merely stating that the unnamed grounds "were preserved at trial," were "fundamental and . . . invalidate[d] the trial," are "well documented," and "affected [his] substantial rights," without actually referring this Court to those alleged fundamental, well-documented, preserved errors allegedly affecting his substantial rights, does not comply with Rule 28(a)(10). Hart v. State,852 So.2d 839, 848 (Ala.Crim.App. 2002) ("By failing to include any citations to the record on this issue, Hart has failed to comply with Rule 28(a)(10), Ala.R.App.P., and has waived this claim for purposes of appellate review.").
Further, even had his argument been sufficient, we note that the trial court's denial of a motion for new trial will not be disturbed on appeal in the absence of a showing of an abuse of discretion. Sistrunk v. State, 630 So.2d 147
(Ala.Crim.App. 1993). After reviewing the trial transcript and Jennings's arguments on appeal, we find no abuse of the trial court's discretion.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.
[1] According to Knox, he had not heard anything so he called his friend in June, at which time the friend told him that they would contact him at the appropriate time. Knox further stated that Jennings periodically asked him about the progress in obtaining the drugs.
[2] In McLemore v. State, 562 So.2d 639
(Ala.Crim.App. 1989), this Court stated:
 "This court is aware that the Alabama Supreme Court has, in two cases, held that the prosecutor's failure to comply with a Rule 18 [Ala.R.Crim.P. (Temp.), now Rule 16, Ala.R.Crim.P.] discovery order mandated a reversal. Ex parte Motley, 534 So.2d 564
(Ala. 1988); Ex parte Lambert, 519 So.2d 899
(Ala. 1987). Both of these cases, however, involved the failure to provide extrajudicial statements of the defendant and apparently involved facts from which the Supreme Court concluded that a reversal was the only sanction which `would accomplish the goals of the discovery rules.' McCrory v. State, 505 So.2d [1272. 1279 (Ala.Crim.App. 1986)]. We note that neither of those cases contained any discussion of the other sanctions for nondisclosure contained in Rule 18.5 [now Rule 16.5]. We, therefore, find those cases distinguishable from the case at bar."
562 So.2d at 646.
[3] To the extent that Jennings intended this argument to challenge the in-court identification itself, we have addressed that claim more thoroughly in Part II of this opinion.
[4] See Part IV.A., of this opinion for further discussion of the trial court's remedy as to this discovery issue.
[5] On one version of his report, one expert identified only one latent fingerprint on one of the bags as Jennings's, whereas the second expert identified two fingerprints on that bag as Jennings's fingerprint.
[6] To the extent that Jennings's argument challenges the trial court's denial of his motion for a new trial, we note that Jennings did not argue how he was prejudiced by the timing of the State's disclosure of the evidence and, therefore, the trial court's denial of his motion for a new trial on these grounds did not constitute an abuse of that court's discretion.
[7] This question was posed during a series of questions in response to which Douglass identified the voices on an audiotape recording while the controlled drug purchase was being arranged and conducted.
[8] The photograph was introduced as Court's exhibit 9 and is contained in the record on appeal. (C. 337.)
[9] The trial court's reasons for denying the motion were extensive and are discussed more thoroughly below.
[10] The trial court's remarks were independent of the arguments advanced during the arguments on the motion for a judgment of acquittal and were not prompted by any objections or arguments of counsel.
[11] Jennings erroneously cites the above-quoted Rule as Rule 16.1, Ala.R.Crim.P.
[12] During the hearing, defense counsel first argued that a mistrial was in order in light of discrepancies in a letter disclosed to the defense some 14 months before trial and the version that was introduced at trial. Defense counsel then argued the timing of the supplemental disclosure and requested the continuance.
 *Page 1